Michael R. Reese
George V. Granade
**REESE LLP**
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272
Email: *mreese@reesellp.com*
        *ggranade@reesellp.com*

Shanon J. Carson
E. Michelle Drake
Shoshana Savett
Sarah R. Schalman-Bergen
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 875-4656
Facsimile: (215) 875-4604
Email: *scarson@bm.net*
        *emdrake@bm.net*
        *stsavett@bm.net*
        *sschalman-bergen@bm.net*

Kevin Landau
Brett Cebulash
Miles Greaves
**TAUS, CEBULASH & LANDAU, LLP**
80 Maiden Lane, Suite 1204
New York, New York 10038
Telephone: (646) 873-7654
Facsimile: (212) 931-0703
Email: *klandau@tcllaw.com*

John A. Yanchunis
Marisa Glassman
**MORGAN & MORGAN
COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 275-5275
Facsimile: (813) 222-4736
Email: *jyanchunis@forthepeople.com*
        *mglassman@forthepeople.com*

*Attorneys for Plaintiff and the Proposed Class*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WENDY MANEMEIT, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> GERBER PRODUCTS CO., a corporation, d/b/a NESTLE NUTRITION, NESTLE INFANT NUTRITION, and NESTLE NUTRITION NORTH AMERICA, <br><br> Defendant. | No. 2:17-cv-00093 <br><br> **CLASS-ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

1

1.     Plaintiff Wendy Manemeit ("Plaintiff"), individually and on behalf of all persons who purchased Gerber Good Start Gentle infant formula ("Good Start"), alleges the following based upon personal knowledge (as to all facts related to herself) and information and belief (as to all other matters).

## NATURE OF THE ACTION

2.     This case involves a pattern of deceptive and unfair business practices by Gerber Products Company ("Gerber" or "Defendant") in the marketing and sale of Good Start, a line of infant formula made with whey-protein concentrate that Defendant produces, distributes, markets, and sells.

3.     Plaintiff brings this class-action lawsuit challenging deceptive and misleading representations that Defendant made in promoting and selling Good Start. Specifically, beginning in 2011, Defendant has claimed in advertising and product labeling that: (a) Good Start is the first and only formula whose consumption reduces the risk of infants developing allergies, and (b) Good Start is the first and only formula that the United States Food and Drug Administration ("FDA") endorses to reduce the risk of developing certain allergies, such as atopic dermatitis. These statements are false and deceptive.

4.     As demonstrated below, this is not the first time that Gerber's corporate parent—Nestle—has made false and misleading statements directly to U.S. consumers about the purported allergic benefits of Good Start. Nestle had, since the late 1980s, manufactured, promoted, marketed, and sold partially hydrolyzed whey-protein infant formulas under the Carnation (another U.S. company that Nestle acquired) Good Start brand name. Nestle had promoted this formula as being "hypoallergenic" but was forced to remove that claim from the product's labels after the FDA began questioning its scientific support. Nestle was also fined by

2

nine states for falsely and misleadingly claiming in its advertisements that Good Start was unlikely to trigger allergies.

5.      As part of its recent scheme, Nestle petitioned the FDA to approve health claims that partially hydrolyzed whey protein reduced the risk of infants developing food allergies.

6.      In 2006, the FDA rejected Nestle's proposed health claims, stating: "Based on FDA's consideration of the scientific evidence and other information submitted with the petition, and other pertinent scientific evidence and information, FDA concludes that there is *no credible evidence* to support the qualified health claim relating consumption of 100 percent partially hydrolyzed whey protein in infant formula to a reduced risk of food allergy, and thus, FDA is denying the petition[.]" (*See* Letter from Michael M. Landa, Deputy Dir. for Regulatory Affairs, U.S. Food & Drug Admin., to Melanie Fairchild-Dzanis, Dir. Regulatory Issues/Special Nutritionals, Nutrition Div., Nestle USA at 9 (May 11, 2006) ("2006 Letter"; attached as Exhibit A).)

7.      In 2007, after the FDA rejected Nestle's petition, Nestle acquired infant-food manufacturer Gerber. While at the time of the acquisition Gerber did not manufacture or sell infant formula, Good Start was eventually rebranded under the Gerber banner.

8.      In 2009, Defendant again petitioned the FDA to approve a claim characterizing the relationship between the consumption of partially hydrolyzed whey-protein infant formula and a reduced risk of developing a specific infant allergy, atopic dermatitis.

9.      The FDA rejected the language Defendant proposed because it misstated the relationship between partially hydrolyzed whey protein and infant allergies and, as a result, would mislead consumers. The FDA stated that it would only consider exercising its enforcement discretion regarding the atopic-dermatitis claim if Defendant modified the claim

3

and included highly qualifying language that "very little scientific evidence" or "little scientific evidence" exists to support a link between partially hydrolyzed whey-protein infant formula and atopic dermatitis; that such a link has been observed only when infants consumed partially hydrolyzed whey-protein infant formula during the first four months of life; and that the FDA considers any such link to be "uncertain" in light of studies that have found no beneficial relationship.

10.    Despite the FDA's rejection of Nestle's first petition (and compelling evidence contradicting Defendant's broad allergy claims), and the FDA's extremely qualified response to Defendant's second petition, Defendant began deceptively advertising Good Start as (among other things) the first and only infant formula to reduce the risk of allergies, generally, and the first and only formula that the FDA endorsed to reduce the risk of atopic dermatitis, without indicating any of the qualifications mentioned by the FDA (i.e., that "little" or "very little" scientific evidence suggested a link between Good Start and atopic dermatitis). Defendant conveyed this misleading message directly to consumers through a pervasive advertising campaign that included, *inter alia*, print and television advertising and statements on Good Start labels. Defendant thus overstated the actual properties of Good Start and disregarded the limitations imposed on it by the FDA.

11.    In October 2014, the United States Federal Trade Commission ("FTC") brought suit against Defendant seeking to enjoin its deceptive practices in relation to the marketing and sale of Good Start, specifically citing Defendant's false or misleading claim "that feeding Good Start formula to infants with a family history of allergies prevents or reduces the risk that they will develop allergies" and the false or misleading claim "that Good Start formula qualified for or received approval for a health claim from the Food and Drug Administration."

4

12.    On October 31, 2014, the FDA informed Defendant in a "Warning Letter" that Good Start was misbranded because the product's label and the company's website made health claims that the FDA had rejected or had not authorized.

13.    Due to Defendant's deceptive representations that Good Start provided health benefits beyond the benefits other baby formulas offered, and Defendant's misleading representations that the FDA had unqualifiedly certified its health claims, Plaintiff and the Class (as defined below) were injured by purchasing Good Start at an inflated cost.

14.    Plaintiff and the Class members bring this consumer-protection action against Defendant based on the course of unlawful conduct set forth herein. Plaintiff alleges violations of New York's General Business Law, sections 349 and 350. Plaintiff also brings common-law claims for fraudulent concealment, intentional misrepresentation, negligent misrepresentation, and unjust enrichment.

## PARTIES

15.    Plaintiff Wendy Manemeit is a resident of New York and a member of the Class. Ms. Manemeit began purchasing Good Start in May, 2015, after seeing and relying on a number of Defendant's misleading advertisements, as described below.

16.    Defendant Gerber Products Company, also doing business as Nestle Nutrition, Nestle Infant Nutrition, or Nestle Nutrition North America, is a Michigan corporation with its headquarters located in Florham Park, New Jersey. Gerber is a subsidiary of Nestle USA, which is a subsidiary of Nestle, S.A. Defendant regularly transacts business in this District, including by marketing, distributing, and selling Good Start in this District.

## JURISDICTION

17.    This Court has original jurisdiction over this case under the provisions of the

Class Action Fairness Act codified at 28 U.S.C. § 1332(d)(2). There is diversity of citizenship because Plaintiff Manemeit is a citizen of New York, while Defendant is a citizen, for diversity purposes, of New Jersey and Michigan. The amount in controversy in this action exceeds $5,000,000, and there are more than 100 members in the Class.

18.    This Court has personal jurisdiction over Defendant for reasons including but not limited to the following: Defendant purposefully avails itself of the privilege of conducting business activities within the territorial boundaries of New York State, thus invoking the benefits and protections of the laws of the State of New York, through Defendant's promotion, marketing, distribution, and sale of consumer goods, including Good Start, in the consumer markets within New York. Defendant is also engaged in systematic and continuous business activity in New York. Thus, Defendant has sufficient minimum contacts with New York that maintenance of this action in this state does not offend traditional notions of fair play and substantial justice.

## VENUE

19.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(1). Defendant resides in this District for venue purposes in that Defendant would be subject to personal jurisdiction in the Eastern District of New York. 28 U.S.C. § 1391 (c)(2), (d).

## FACTUAL ALLEGATIONS

**A.  Defendant's history of falsely promoting the Allergenic Benefits of Good Start:**

20.    Nestle, Gerber's parent, has a long and checkered history of manufacturing, selling, promoting and marketing Good Start and other infant formulas in the United States and around the world. There have been numerous boycotts related to Nestle's direct-to-consumer sales and marketing practices in countries outside of the United States. These practices and the

attendant boycotts led, in part, to the World Health Organization's adopting the International

Code of Marketing Breast-Milk Substitutes (the "WHO Code"), which banned direct to

consumer advertising in those countries that adopted the Code. While the United States has not

adopted the WHO Code, there was—into the late 1980s—a voluntary ban on such advertising.

21.     Though Nestle was a major supplier of infant formula worldwide, Nestle did not

sell infant formula in the United States until the late 1980s. Nestle had acquired Carnation in

1984, and in 1988 announced that it would enter the United States infant formula market by

promoting its Good Start formula (which it was already manufacturing and selling in Europe)

directly to consumers in the United States under the banner of the Carnation brand. Nestle

expected its formula to capture 25–30% of the infant-formula market in the United States within

a few years of its introduction.  Denise Gellene, *Carnation to Move Into U.S. Baby Formula

Market*, L.A. Times, June 4, 1988, *available at* http://articles.latimes.com/1988-06-

04/business/fi-3994_1_infant-formula-market.

22.     The announcement of Nestle's plans to market the formula directly to consumers

created an uproar in the pediatric community, including the American Academy of Pediatrics. As

the Los Angeles Times reported on July 2, 1988, in an article entitled "Marketing to Moms:

Pediatricians Say Carnation Crosses a Fine Ethical Line in Direct Sales of Baby Formula":

> Carnation, which is owned by the Swiss company, Nestle, has unveiled plans to
> introduce a formula—called Good Start—for infants who are allergic to
> traditional milk and soybean-based formulas. Good Start and Good Nature, a
> formula for infants who have begun to eat solid foods, will be advertised in
> magazines that are read by new mothers—a break with the voluntary ban on such
> ads.

Jesus Sanchez, *Marketing to Moms: Pediatricians Say Carnation Crosses a Fine Ethical

Line in Direct Sales of Baby Formula*, L.A. Times, July 2, 1988, *available at*

http://articles.latimes.com/1988-07-02/business/fi-5340_1_baby-formula.

23.    Nestle eventually resolved its dispute with the American Academy of Pediatrics "by agreeing not to link Carnation's name to a public information campaign on allergic reactions to infant formula." George White, *Carnation Says It Has Settled Dispute on Ads: Pediatrics Group Hit Campaign on Formulas*, L.A. Times, July 15, 1988, *available at* http://articles.latimes.com/1988-07-15/business/fi-7239_1_ad-campaign.

24.    Nestle violated the spirit of this agreement, however, by promoting Good Start's purported hypoallergenic properties on its label. On March 11, 1989, the Los Angeles Times reported that, following a request from the FDA for more information on its purported allergy claims, "Carnation Co., under fire for using an infant formula label that has been called misleading, on Friday said it will remove the term 'hypo-allergenic' from its Good Start H.A. product. Carnation said the label change, which will be effective in April, is being made to eliminate potential consumer confusion . . . ." George White, *Carnation to Alter Label on Baby Formula*, L.A. Times, March 11, 1989, *available at* http://articles.latimes.com/1989-03-11/business/fi-773_1_infant-formula-label.

25.    After agreeing to remove the term "hypoallergenic" from the Good Start label, Carnation also agreed to pay fines to nine states over claims that "it used misleading advertising to promote its new infant formula as unlikely to trigger allergies." Jesus Sanchez, *Carnation to pay $90,000 fine in wake of claims its ads misled Los Angeles Times*, L.A. Times, July 7, 1989, *available at* http://articles.latimes.com/1989-07-07/business/fi-3433_1_health-claims.

26.    By 1990, Nestle failed to gain the 25–30% share that it had projected. As Carnation's promotional efforts for Good Start floundered, on December 31, 1990, the Los Angeles Times reported that Carnation decided to reverse course on direct-to-consumer advertising and, "over the objections of pediatricians and advocates of breast feeding, will begin

advertising its Good Start formula directly to mothers, beginning in January." Jesus Sanchez, *Nestle's New Accent*, L.A. Times, Dec. 31, 1990, *available at* http://articles.latimes.com/1990-12-31/business/fi-5671_1_food-industry**.**

27.    But even after reviving its plan to advertise directly to consumers, Nestle was unable to capture its desired U.S. market share, which remained below 5%. Nestle eventually blamed this on a conspiracy between doctors and dominant formula makers to prevent direct-to-consumer advertising, and brought an antitrust action against these parties in 1993.

28.    On June 21, 1995, jurors rejected Nestle's antitrust case. Thereafter, the Ninth Circuit rejected Nestle's appeal, affirming the district court's determination.  *See Nestle Food Co. v. Abbott Labs, et al*, 105 F.3d 665 (9th Cir. 1997).

29.    After losing in court, Nestle continued promoting Good Start directly to consumers. Nestle also looked to again promote the purported allergenic health benefits of its Good Start formula. As part of that strategy, and as described more fully below, in June 2005 Nestle petitioned the FDA for approval of a qualified health claim that Good Start can reduce the risk of common food-allergy symptoms. The FDA rejected that claim in May 2006, finding that there was "no credible evidence" to support it.

30.    Following the FDA's denial of its Good Start allergy claims, in 2007 Nestle acquired Gerber Products Company, which at the time was a leading manufacturer and seller of infant food but did not manufacture or sell infant formula. In a slide presentation from Nestle S.A. announcing the acquisition, dated April 12, 2007, Nestle touted that one important feature of the acquisition would be to allow Nestle to "Leverag[e] the trust and well-being reputation of the Gerber brand." At some point following Gerber's acquisition, Nestle rebranded "Good Start" as "Gerber Good Start."

31.     Thereafter, and at least since 2011, Defendant has manufactured, distributed, promoted, offered for sale, and sold Good Start. Defendant has advertised and continues to advertise Good Start through television commercials, print advertisements, point-of-sale displays, product packaging, internet advertisements, and other promotional materials.

**B.  Federal law requires FDA approval before companies can make a legal "health claim."**

32.     Under federal regulations, a "health claim" is "any claim made on the label or in labeling of a food, including a dietary supplement, that expressly or by implication, including 'third party' references, written statements (*e.g.*, a brand name including a term such as 'heart'), symbols (*e.g.*, a heart symbol), or vignettes, characterizes the relationship of any substance to a disease or health-related condition." 21 C.F.R. § 101.14(a)(1).

33.     The FDA may promulgate a regulation allowing a health claim if the FDA "determines, based on the totality of publicly available scientific evidence (including evidence from well-designed studies conducted in a manner which is consistent with generally recognized scientific procedures and principles), that there is significant scientific agreement, among experts qualified by scientific training and experience to evaluate such claims, that the claim is supported by such evidence." 21 U.S.C. § 343(r)(3)(B)(i).

34.     In the absence of "significant scientific agreement" on a claim, the FDA may nevertheless allow a company to make a "qualified health claim" if it is supported by less convincing scientific evidence. Because of the lack of scientific agreement, the claim must use qualifying language to accurately communicate the level of scientific evidence supporting the claim, to ensure that it is not false or misleading to consumers.

35.     All health claims, whether qualified or unqualified, require pre-market review by the FDA.

**C. The FDA determined that "there is no credible scientific evidence" to support a qualified health claim linking partially hydrolyzed whey protein to a reduction of common food allergies.**

36.    Defendant maintains that Good Start contains partially hydrolyzed whey protein. The first ingredient on the Good Start label is "Whey Protein Concentrate (from cow's milk, enzymatically hydrolyzed, reduced in minerals)."

37.    Whey protein is derived from cow's milk during the production of cheese.

38.    Partially hydrolyzed whey protein undergoes additional processing to break the protein into smaller fragments.

39.    In June 2005, Nestle petitioned to have the following qualified health claim approved by the FDA:

> Breastfeeding is the best way to nourish infants. For infants who are not exclusively breastfed, emerging clinical research in healthy infants with family history of allergy shows that feeding a 100% Whey-Protein Partially Hydrolyzed formula may reduce the risk of common food allergy symptoms, particularly allergic skin rash, when used instead of whole-protein cow's milk formula from the initiation of formula feeding.

(Ex. A at 1–2.)

40.    On May 11, 2006, the FDA rejected Nestle's petition. The FDA considered "scientific evidence and other information submitted with the petition, and other pertinent scientific evidence and information" and rejected the petition because there was "no credible evidence to support the qualified health claim relating consumption of 100 percent partially hydrolyzed whey protein in infant formula to a reduced risk of food allergy." (*Id.* at 2, 9.) The FDA determined that "neither a disclaimer nor qualifying language would suffice to prevent consumer deception in this circumstance, where there is no credible evidence to support the claim." (*Id.* at 8.)

**D. The FDA rejected Defendant's petition for a health claim linking partially hydrolyzed whey protein to a reduced risk of atopic dermatitis.**

41.     In May 2009, following the acquisition of Gerber, Defendant petitioned to have the following qualified health claim approved by the FDA:

> Breastfeeding is the best way to nourish infants. For infants who are not exclusively breastfed, emerging clinical research shows that, in healthy infants with family history of allergy, feeding a 100% Whey-Protein Partially Hydrolyzed infant formula instead of a formula containing intact cow's milk proteins may reduce the risk of developing the most common allergic disease of infancy—atopic dermatitis—throughout the 1st year of life and up to 3 years of age.

(*See* Letter from Barbara O. Schneeman, Ph.D., Dir., Office of Nutrition, Labeling, & Dietary Supplements, Ctr. for Food Safety & Applied Nutrition, U.S. Food & Drug Admin., to Melanie Fairchild-Dzanis, Regulatory Discretion, Inc. (on behalf of Nestle Nutrition) at 1–2 (May 24, 2011) ("2011 Letter"; attached as Exhibit B).)

42.     In May 2011, the FDA rejected Defendant's claim as proposed because it "mischaracterize[d] the strength of the evidence and [was] misleading." (*Id.* at 12–13.)

43.     After reviewing the scientific evidence relevant to the petition, the FDA determined that there was no evidence to support the broad claim Defendant wished to assert. The only testing that showed any beneficial connection between consumption of 100% whey-protein partially hydrolyzed formula and a reduction in atopic dermatitis "included the feeding of such formula to infants only during the first 4 months of life." (*Id.* at 11.) Without language specifying the time period in which the infants were fed the formula (i.e., birth to four months), the FDA "would consider the qualified health claim to be misleading . . . because the record contains no evidence that feeding an infant the formula at a different time period would have any effect on reducing the risk of atopic dermatitis." (*Id.*) The FDA concluded that there "is very little credible evidence for a qualified health claim about the relationship between feeding a 100

12

percent whey-protein partially hydrolyzed infant formula for the first 4 months of life and a reduced risk of atopic dermatitis throughout the first year of life and up to 3 years of age" and "that there is little credible evidence for a qualified health claim about the relationship between feeding 100 percent whey-protein partially hydrolyzed infant formula for the first four months of life and a reduced risk of atopic dermatitis throughout the first year of life." (*Id.* at 10, 11.)

44. In its letter responding to Defendant's May 2009 petition, the FDA stated that it "intends to consider the exercise of its enforcement discretion" for the following four qualified health claims, which it enumerated in the letter:

1. "Very little scientific evidence suggests that, for healthy infants who are not exclusively breastfed and who have a family history of allergy, feeding a 100% Whey-Protein Partially Hydrolyzed infant formula from birth up to 4 months of age instead of a formula containing intact cow's milk proteins may reduce the risk of developing atopic dermatitis throughout the 1st year of life and up to 3 years of age."

2. "Little scientific evidence suggests that, for healthy infants who are not exclusively breastfed and who have a family history of allergy, feeding a 100% Whey-Protein Partially Hydrolyzed infant formula from birth up to 4 months of age instead of a formula containing intact cow's milk proteins may reduce the risk of developing atopic dermatitis throughout the 1st year of life."

3. "For healthy infants who are not exclusively breastfed and who have a family history of allergy, feeding a 100% Whey-Protein Partially Hydrolyzed infant formula from birth up to 4 months of age instead of a formula containing intact cow's milk proteins may reduce the risk of developing atopic dermatitis throughout the 1st year of life and up to 3 years of age. FDA has concluded that the relationship between 100% Whey-Protein Partially Hydrolyzed infant formulas and the reduced risk of atopic dermatitis is uncertain, because there is very little scientific evidence for the relationship."

4. "For healthy infants who are not exclusively breastfed and who have a family history of allergy, feeding a 100% Whey-Protein Partially Hydrolyzed infant formula from birth up to 4 months of age instead of a formula containing intact cow's milk proteins may reduce the risk of developing atopic dermatitis throughout the 1st year of life. FDA has concluded that the relationship between 100% Whey-Protein Partially Hydrolyzed infant formulas and the reduced risk of atopic dermatitis is uncertain, because there is little scientific evidence for the relationship."

(*Id.* at 13.)

**E. Scientific studies conclude that partially hydrolyzed whey formula does not lower the risk of allergic manifestations in infancy.**

45.    Several compelling scientific studies have concluded that partially hydrolyzed whey formula does not lower the risk of allergic manifestations, including eczema, during infancy (and up to age 7) when compared with conventional formula.

46.    For example, a major long-term study published in June 2011—*after* the FDA sent Defendant its 2011 letter—concluded that "[t]here was no evidence that introducing pHWF [(partially hydrolyzed whey formula)] at the cessation of breast-feeding reduced the risk of allergic manifestations, including eczema, asthma, and allergic rhinitis, in [a] study of high-risk infants." Adrian J. Lowe, Ph.D., *et al.*, Effect of a partially hydrolyzed whey infant formula at weaning on risk of allergic disease in high-risk children: A randomized controlled trial, 128 J. Allergy & Clinical Immunology 2, Aug. 2011, at 360–65 ("Lowe Study"), *available at* http://www.jacionline.org/article/S0091-6749%2810%2900740-2/pdf.

47.    The Lowe Study further concluded that partially hydrolyzed whey formula did not reduce the risk of allergic manifestations, including eczema (1) in children from birth to age 7, and (2) in children both with and without a family history of eczema when compared with conventional formula. *Id.* at 362–63.

48.    The Lowe Study did "not support the recommendation that [partially hydrolyzed whey formula] should be used after breast-feeding as a preventative strategy for infants at high risk of allergic diseases." *Id.* at 365.

49.    The Lowe study, among others, thus *conclusively refuted* the idea that partially hydrolyzed whey protein reduced the risk of allergies; it did not simply determine that the relationship was uncertain or open for debate.

50.    Nestec Ltd., a subsidiary of Nestle Australia Ltd., provided the Lowe Study with

14

study formula and staff funding for the first six years of the study. *Id.* at 360 (note).

51.    Upon information and belief, Nestec Ltd. and Nestle Australia Ltd. are affiliated

with Defendant. *See* Nestle S.A., Annual Report 2013 at 154, 165, 170, *available at*

http://www.nestle.com/asset-library/documents/library/documents/annual_reports/2013-annual-

report-en.pdf (last visited Feb. 26, 2015).

**F. Defendant begins falsely marketing Good Start.**

52.    Despite the FDA's clear statements detailed above, Defendant engaged in false

and misleading marketing of Good Start as a product capable of reducing the risk of allergies,

generally, and unqualifiedly reducing the risk of atopic dermatitis, specifically.

53.    These claims allowed Defendant to charge a higher price for its formula than it

otherwise could have; to attract more customers than it otherwise could have; and to earn more

revenues than it otherwise could have.

54.    Since at least 2011, Defendant has disseminated, or has caused dissemination of,

advertisements, packaging, and promotional materials for Good Start (including in Illinois and

New York) containing false and misleading statements, as the following sample of Good Start

promotional materials demonstrates.

55.    In Exhibit C, a safety-seal sticker included on a formula canister, Defendant states

that Good Start is the "1ˢᵗ & Only Routine Formula TO REDUCE THE RISK OF

DEVELOPING ALLERGIES." This statement is deceptive and misleading. Exhibit C

deceptively communicates to consumers that Good Start reduced the risk of infants developing

allergies, despite the lack of evidence supporting that proposition, an FDA letter rejecting such a

broad health claim, and compelling evidence contradicting the claim.

56.    In Exhibit D, Defendant includes a gold badge with the words "MEETS FDA"

printed at the top, "1st AND ONLY" printed in the center, and "QUALIFIED HEALTH CLAIM" printed at the bottom. The packaging further includes a statement that Good Start "is the first and only formula brand . . . that meets the criteria for a FDA Qualified Health Claim for atopic dermatitis." This advertisement deceptively implies that the FDA fully endorsed Defendant's atopic-dermatitis claims, despite the fact that the FDA's endorsement was strictly reserved to claims indicating that there was "little" or "very little" evidence supporting the link between Good Start and atopic dermatitis. And, by not including any language indicating these reservations, or that its atopic-dermatitis claims were at best "uncertain," Defendant falsely or misleadingly implied that Good Start would *unqualifiedly* reduce the risk of atopic dermatitis, despite the fact that there was (again) "little" or "very little" evidence supporting this claim.[1]

57.    Exhibit D also deceptively uses the FDA term of art "qualified health claim" to convey that Good Start is fit for a particular purpose or certified by the FDA when "qualified health claim" actually means the claim is supported by only lacking, limited, or contradictory scientific evidence.

58.    Defendant included Exhibit D on exterior product packaging. Defendant also featured the gold badge in Exhibit B (including the words "MEETS FDA," "1st AND ONLY," and "QUALIFIED HEALTH CLAIM") on supermarket displays advertising Good Start, without suggesting any of the qualifications mentioned by the FDA.

59.    In Exhibit E, a television commercial (storyboard dated April 9, 2012), an

---

[1] The FDA's 2011 Letter, for example, notes that while Gerber attempted to support its atopic-dermatitis claims by citing a *number* of studies, only a handful were actually relevant: two studies found a beneficial link between Good Start and atopic dermatitis up the age of three, while two did not. As to benefits within the first year of life, only one study found a link; two did not. (Ex. B at 9–11.)

announcer states that "You want your Gerber baby to have your imagination . . . your smile . . . your eyes . . . not your allergies. . . . [I]f you introduce formula, choose the Gerber Good Start Comfort Proteins Advantage." *See Gerber Good Start Gentle Formula with Comfort Proteins Advantage®* (Gerber Prods. Co. television commercial), *available at* https://www.youtube. com/watch?v=h6l-CjygjEg (last visited Dec. 8, 2015). This advertisement deceptively communicates to consumers that Good Start reduces the risk of infants developing allergies, despite compelling evidence contradicting that proposition and an FDA letter rejecting Defendant's health claim.

60.    In Exhibit F, a direct to consumer print advertisement depicting a baby's face on a canister of Good Start, the caption reads:

> The Gerber Generation says "I love Mommy's eyes, not her allergies."
>
> If you have allergies in your family, breastfeeding your baby can help reduce their risk. And, if you decide to introduce formula, research shows the formula you first provide your baby may make a difference. In the case of Gerber® Good Start® Gentle Formula, it's the Comfort Proteins® Advantage that is easy to digest and may also deliver protective benefits. That's why Gerber® Good Start® Gentle Formula is nutrition inspired by breastmilk.

Exhibit F deceptively communicates to consumers that Good Start reduces the risk of infants developing allergies, despite compelling evidence contradicting that proposition and an FDA letter rejecting Defendant's health claim.

61.    In Exhibit G, a direct-to-consumer magazine advertisement, Defendant deceptively promoted Good Start as "the first and only infant formula that meets the criteria for a FDA Qualified Health Claim." This advertisement deceptively implies that the FDA fully endorsed Defendant's atopic-dermatitis claims, despite the fact that the FDA's endorsement was strictly reserved to claims indicating that there was "little" or "very little" evidence supporting the link between Good Start and atopic dermatitis. And, by not including any language indicating

these reservations, or that its atopic-dermatitis claims were at best "uncertain," Defendant falsely or misleadingly implied that Good Start would *unqualifiedly* reduce the risk of atopic dermatitis, despite the fact that there was (again) "little" or "very little" evidence supporting this claim. The advertisement in Exhibit G also deceptively uses the FDA term of art "qualified health claim" to convey that Good Start is fit for a particular purpose or certified by the FDA when "qualified health claim" actually means the claim is lacking or limited.

62.     Exhibit H, an advertisement printed in People Magazine on August 5, 2013, depicts a mother feeding an infant and includes a badge stating that Good Start is the "1st FORMULA WITH FDA QUALIFIED HEALTH CLAIM." This advertisement deceptively implies that the FDA fully endorsed Defendant's atopic-dermatitis claims, despite the fact that the FDA's endorsement was strictly reserved to claims indicating that there was "little" or "very little" evidence supporting the link between Good Start and atopic dermatitis. And, by not including any language indicating these reservations, or that its atopic-dermatitis claims were at best "uncertain," Defendant falsely or misleadingly implied that Good Start would *unqualifiedly* reduce the risk of atopic dermatitis, despite the fact that there was (again) "little" or "very little" evidence supporting this claim. This advertisement also misleadingly employs the FDA term of art "qualified health claim" to convince consumers that Good Start was fit for a particular purpose or certified for quality by the FDA when "qualified health claim" actually means the claim is supported by lacking or limited scientific evidence.

63.     Further, none of the advertisements described above mention that Good Start's limited atopic-dermatitis benefits were only realizable (potentially) if Good Start was fed to infants under four-months old, as indicated in the FDA's 2011 Letter (*see supra* ¶ 44).

64.     Based on this limited sampling, it is reasonable and plausible to infer that

discovery will demonstrate a protracted course of purposeful, deceptive, and misleading marketing and advertising by Defendant to induce consumers to purchase Good Start during the Class period.

## G. The FTC files a lawsuit against Defendant for violations of the Federal Trade Commission Act.

65.    On October 29, 2014, the FTC filed a lawsuit in the United States District Court for the District of New Jersey against Defendant "under Section 13(b) of the Federal Trade Commission Act ('FTC Act'), 15 U.S.C. § 53(b), to obtain preliminary and permanent injunctive relief . . . for Defendant's acts or practices, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, in connection with the labeling, advertising, marketing, distribution, and sale of Gerber Good Start Gentle, an infant formula that purports to prevent or reduce the risk of the development of allergies." Complaint at 2, *F.T.C. v. Gerber Prods. Co*., No. 2:14-cv-06771-SRC-CLW (D.N.J. Oct. 29, 2014), ECF No. 1.

66.    In its Complaint, the FTC specifically challenged Defendant's false, misleading, or unsubstantiated claim that "feeding Good Start formula to infants with a family history of allergies prevents or reduces the risk that they will develop allergies" and Defendant's false or misleading assertions that "Good Start formula qualified for or received approval for a health claim from the Food and Drug Administration." *Id*. at 9–10.

## H. The FDA warns Defendant that Good Start is misbranded and misleading in violation of federal law.

67.    In addition to the FTC's lawsuit, on October 31, 2014, the FDA wrote a Warning Letter to Mr. Gary Tickle, President and CEO of Defendant Nestle Infant Nutrition, outlining various false and misleading representations made in the promotion of Good Start that violate federal law and related federal regulations. (Letter from William A. Correll, Jr., Dir., Office of

19

Compliance, Ctr. for Food Safety & Applied Nutrition, U.S. Food & Drug Admin., to Gary

Tickle, President & CEO, Nestlé Infant Nutrition (Oct. 31, 2014) ("Warning Letter"; attached as

Exhibit I).)

      68.     In the Warning Letter, the FDA alleged the following statutory violations, without

limitation:

      a)     Good Start was misbranded under the Federal Food, Drug, and Cosmetic

Act, 21 U.S.C. §§ 301 *et seq*., because Good Start's labeling and website "bear health claims that

were not authorized by the FDA." (*Id.* at 1, 2.)

      b)     Defendant's health claim that the consumption of 100% partially

hydrolyzed whey protein reduces the risk of infants developing allergies was a health claim the

FDA previously considered and denied and was therefore unauthorized. (*Id* at 1–2.)

      c)     Defendant failed to ensure consumer safety by not properly informing

consumers that Good Start should not be fed to infants with milk allergies and that such infants'

"care and feeding choices should be under a doctor's supervision." (*Id.* at 3.) Defendant also

omitted to include key information in mandatory bold type and excluded other mandatory

language entirely. (*Id.* at 3, 4–5.)

      d)     Good Start is misbranded because Defendant wrongly identified "100%

whey partially hydrolyzed" as the substance linked to a reduced risk of atopic dermatitis on

Good Start's label and website. (*Id.* at 3–4.) However, the substance that was the subject of

Defendant's 2011 qualified-health-claim petition to the FDA was "100% whey protein partially

hydrolyzed." (*Id*.) As such, Defendant's health claim regarding atopic dermatitis misleads

consumers because it suggests "that the partial hydrolysis of whey could refer to any or all of the

components in whey being hydrolyzed (*i.e.*, oligosaccharides, fats, and protein)," and no

20

evidence exists to support such claim. (*Id.*)

    e) Defendant separated qualifying language related to its atopic-dermatitis health claim in a way the FDA did not approve in its 2011 letter of enforcement discretion to Defendant. (*Id.* at 5–6.) The FDA expressed concerns that such separation could mislead consumers. (*Id.*)

69. In the Warning Letter, the FDA instructed Defendant to "take prompt action to correct the violations described above" or face potential legal action. (*Id.* at 5.)

70. In a letter dated November 19, 2014, to the FDA, Mr. Tickle discussed the corrective actions Defendant was taking in response to the FDA's Warning Letter. Among other things, Mr. Tickle discussed the use of the tamper-evident seal shown in Exhibit C, stating specifically, "We have revisited the issue following receipt of the [Warning] Letter and have made the decision to discontinue the sticker" beginning in January 2015 (though, because there was no recall of the product, the sticker remained in circulation for some time after that).

71. On July 13, 2015, the FDA issued a "Close Out Letter" to Defendant. In the Close Out Letter, the FDA described its evaluation of Defendant's corrective actions and stated "it appears that you have addressed the violations" contained in the Warning Letter.

**I. Plaintiff purchased Good Start based on Defendant's misleading campaign.**

72. Plaintiff Manemeit, a New York resident, purchased roughly 120 canisters of powdered Good Start beginning in May, 2015, typically from a Target or Stop & Shop located near her home in Farmingville, New York, at roughly $25 a canister.

73. Ms. Manemeit's decision to purchase Good Start was based on Defendant's deceptive advertising and unfair business practices as set forth herein. For example, Ms. Manemeit saw and relied on Defendant's magazine advertisements (Exs. F–H) and television

advertisement (Ex. E) in deciding to purchase Good Start.

74.    Reasonable consumers, including Plaintiff, would and did attach importance to the health and FDA-approval claims specified herein when determining whether to purchase Good Start. For example, parents or caretakers, like Plaintiff, are obviously concerned with the health of their children, and their decision to purchase (or pay a premium for) a formula would be influenced by claims that: partially hydrolyzed whey protein reduces the risk of allergies (including atopic dermatitis) in children, and the FDA unequivocally endorsed the health claims Defendant made on its labels, in its advertisements, and on its website.

75.    Plaintiff would not have purchased Gerber Good Start Gentle—or would not have purchased it for the prices that she did—had she known that Good Start did not reduce the risk of allergies, generally, or that the atopic-dermatitis were supported by minimal and conflicting scientific evidence, at best, and that the FDA did not endorse, approve, or certify the health claims Defendant made on Good Start labels and advertising.

76.    Further, Plaintiff and the Class members reasonably relied on Defendant's health and FDA-approval claims, which were made by a nationally recognized baby-food manufacturer.

77.    The prices Defendant charged for Good Start—which Plaintiff and the Class paid—were inflated as a result of Defendant's misleading health claims. In 2012, for example, Walmart sold Parent's Choice, which did not make any allergenic health claims, at roughly $0.54 per ounce, and Good Start Gentle at $0.91 per ounce; i.e., Parent's Choice sold at a 41% discount to Good Start Gentle during the class period. *See* https://web.archive.org/web/20120812020834/ http://www.walmart.com/browse/baby/formula/5427_133283_1001447/? (last visited Dec. 8, 2015). Moreover, Plaintiff did not receive the benefit of her bargain insofar as she paid for a benefit (i.e., the reduced risk of allergies) that Good Start did not actually provide. At all times

during the Class Period, alternative, less expensive infant formulas were available for purchase.

78.     Moreover, Nestle's corporate financial filings indicate that while Defendant was making the statements at issue here, those advertisements had a beneficial impact on sales of Good Start in the United States. As Nestle disclosed in its 2013 Annual Report, released in or around February 2014, "The US benefited from the continued roll-out of innovations to help prevent colic and allergies, strengthening the *Gerber* brand franchise." Nestle 2013 Annual Report at 64. However, in its 2014 Annual Report, which was released after Defendant received the FDA Warning Letter and the FTC complaint, Nestle neither touted increased benefits from allergy "innovations" nor of "strengthening the *Gerber* brand franchise," but instead reported that in North America "the environment was more challenging." Nestle 2014 Annual Report at 52, *available at https://www.nestle.com/asset-library/documents/library/documents/annual_reports/2014-annual-report-en.pdf* (last visited Dec. 22, 2016).

79.     Because Plaintiff and the Class paid a premium for Good Start that they would not have paid had they known that Good Start did *not* reduce the risk of allergies, or that Defendant's atopic-dermatitis claims were at best "uncertain," and not unequivocally endorsed by the FDA, Plaintiff and the Class incurred damages resulting from Defendant's misconduct. Plaintiff has also been damaged in the full amount of her formula costs, insofar as she would not have purchased Good Start at all had she known of Gerber's false advertising, or because Gerber should not be allowed to retain any unjustly procured revenue.

## **CLASS-ACTION ALLEGATIONS**

80.     Plaintiff Manemeit asserts her claims on behalf of:

All persons who have purchased Good Start infant formula in the state of New York from May 15, 2011, to the present (the "New York Class"). The New York Class excludes the judge or magistrate assigned to this case, Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors,

legal representatives, successors, and assigns. Also excluded from the New York Class are persons who purchased Good Start infant formula for the purpose of resale and persons who assert claims for personal injury.

81.    Plaintiff collectively brings claims on behalf of:

All persons who have purchased Good Start infant formula in the United States from May 15, 2011 to the present (the "Nationwide Class"). The Nationwide Class excludes the judge or magistrate assigned to this case, Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, and assigns. Also excluded from the Nationwide Class are persons who purchased Good Start infant formula for the purpose of resale and persons who assert claims for personal injury and persons who purchased Good Start in California and in the District of Columbia.

82.    Plaintiff refers to the New York and Nationwide Classes together as the "Class."

83.    *Numerosity*: The New York and Nationwide Classes are each so numerous that joinder of all members is impracticable. The Classes each include thousands of consumers who purchased Defendant's Good Start products.

84.    *Typicality*: Plaintiff's claims are typical of the claims of the Class members because, like the other Class members, Plaintiff was exposed to and relied upon Defendant's deceptive advertising and business practices and purchased Good Start at inflated prices as a result of Defendant's misrepresentations.

85.    *Adequacy*: Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced in class-action litigation. Plaintiff has no interests that are adverse to the members of the Class she seeks to represent.

86.    *Commonality*: Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including, without limitation:

    a)  whether Defendant deceptively advertised Good Start as a product capable of reducing the occurrence of allergies in infants;

24

b) whether Defendant sold Good Start at inflated prices as a result of its misrepresentations;

c) whether Defendant violated the New York's General Business Law;

d) whether Defendant violated the Illinois Consumer Fraud and Deceptive Trade Practices Act, and

e) whether Plaintiff and the Class are entitled to damages.

87.     These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual members of the Class.

88.     Discovery will inform the proper form and manner of notice to Class members. Plaintiff anticipates, however, that notice by direct mail will be given to Class members who can be specifically identified, including, without limitation, by the use of store records where Good Start was purchased and the use of reward clubs that record all purchases. In addition, notice may be published in appropriate publications, on the internet, in press releases, and in similar communications in a way that is targeted to reach those who may have purchased Good Start infant formula. Defendant should bear the cost of notice, regardless of whether notice occurs after class certification, trial, or settlement before trial.

89.     Class certification is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant.

90.     Class certification is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or

substantially impair or impede their ability to protect their interests.

91.     Class certification is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

92.     Plaintiff reserves the right to modify or amend the Class definition at any time before certification.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of New York's General Business Law, N.Y. Gen. Bus. Law §§ 349
### (on behalf of Plaintiff Manemeit and the New York Class)

93.     Plaintiff Manemeit repeats and incorporates the preceding paragraphs.

94.      New York General Business Law section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade, or commerce . . . in this state."

95.     Defendant engaged in consumer-oriented conduct by falsely and misleadingly advertising directly to consumers.

96.     As noted above, Defendant's claim that Good Start would reduce the risk of developing "allergies," generally, was false because scientific studies have affirmatively refuted the idea that pHWP possesses that benefit, and Defendant was aware of this fact prior to disseminating its advertisements.

97.     Also as noted above, Defendant's suggestion that Good Start would unequivocally reduce the risk of atopic dermatitis, and that the FDA unequivocally supported this claim, was false and misleading because, among other things, whatever scientific evidence supported this claim was limited, at best, and the FDA only approved of claims that contained

26

these qualifications.

98.      Defendant's advertisements were likely to mislead a consumer acting reasonably under the circumstances. As noted above, new or expecting parents, upon reading that Good Start would reduce the risk of developing allergies, generally, would reasonably believe this claim, given—among other things—that it was being made by a nationally recognized and well-established infant-food manufacturer.

99.      For similar reasons, because Defendant failed to qualify its atopic-dermatitis claims, or its claims about FDA support, a reasonable consumer would believe, without qualification, that Good Start would reduce the risk of atopic dermatitis, and that the FDA had unqualifiedly endorsed Good Start's health claims.

100.      New or expecting parents—or parents in general—are concerned about the health of their children, and would find material, and place a value on, any claim suggesting that a formula might prevent their children from developing allergies, generally, or atopic dermatitis (eczema), specifically.

101.      Plaintiff Manemeit was injured by Defendant's deceptive advertisements insofar as, but for those advertisements, she would not have paid a premium for Good Start—representing the value of Defendant's allergy claims (a benefit that Plaintiff did not receive)—or would not have purchased Good Start at all.

102.      Defendant made its untrue and/or misleading statements and representations willfully and knowingly. Aside from being aware of the Lowe study, which disproved the general allergy claims and was partially funded by Defendant's parent company, Defendant was obviously aware of the results of their FDA petition and the FDA's qualifications of any atopic-dermatitis claims, as well as the mixed scientific evidence addressing those claims.

103.    There is no adequate remedy at law.

104.    Plaintiff Manemeit seeks all appropriate relief under GBL § 349, including monetary, compensatory, treble, and punitive damages, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

### COUNT II
### Violations of New York's General Business Law, N.Y. Gen. Bus. Law § 350
### (on behalf of Plaintiff Manemeit and the New York Class)

105.    Plaintiff Manemeit repeats and incorporates the preceding paragraphs.

106.    Because the pleading requirements of New York General Business Law section 350—which specifically prohibits false advertising—are identical to section 349, Plaintiff Manemeit reiterates the allegations above: (1) that Defendant engaged in consumer-oriented activity by advertising directly to consumers; (2) that the advertisements described above and attached to this Complaint were false and misleading, and would have deceived a reasonable consumer; and (3) that Plaintiff was injured by Defendant's advertisements, which caused her to pay a premium for Good Start or to pay for a product that she otherwise would have avoided.

107.    Plaintiff also realleges that Defendant made its false and misleading advertisements willfully and knowingly.

108.    Plaintiff Manemeit seeks all appropriate relief under GBL § 349, including monetary, compensatory, treble, and punitive damages, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

## COUNT III
## Fraudulent Concealment
### (on behalf of Plaintiff and the Nationwide Class)

109.     Plaintiff Manemeit realleges and incorporates the preceding paragraphs.

110.     Defendant intentionally concealed the fact that Good Start did not in fact reduce the risk of infant allergies; that there was little scientific evidence supporting its atopic-dermatitis claims; and that the FDA had not, in fact, unqualifiedly endorsed these atopic-dermatitis claims (among other things).

111.     Defendant's misrepresentations were contained in Good Start's labels and in national advertisements that were viewed by Plaintiff prior to purchasing Good Start.

112.     Defendant had a duty to disclose that Good Start did not reduce the risk of infant allergies; that there was very little scientific evidence supporting its atopic-dermatitis claim; and that the FDA did not unqualifiedly endorse Defendant's health claims (among other things).

113.     Defendant's concealments were material because parents are concerned with the health of their newborns and their formula-purchasing decisions would be influenced by Defendant's allergenic health claims. Relatedly, if Defendant had not omitted certain facts, Plaintiff would not have purchased Good Start, or would have done so only at a reduced price.

114.     Defendant knew or recklessly disregarded that its representations were false when made because, among other things, it was aware of the Lowe study, which found no correlation between Good Start and allergy reduction; was aware that there was little support for its atopic-dermatitis claim; and was aware that the FDA only endorsed a heavily qualified atopic-dermatitis claim (among other things).

115.     Defendant fraudulently concealed the above-mentioned information with the intent to deceive purchasers of Good Start, like Plaintiff, in order to boost sales.

116.    Plaintiff and the other Class members relied on Defendant's reputation in purchasing Good Start.

117.    As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase.

118.    Defendant's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## COUNT IV
### Intentional Misrepresentation
### (on behalf of Plaintiff and the Nationwide Class)

119.    Plaintiff realleges and incorporate the preceding paragraphs.

120.    Defendant made several intentional misrepresentations, including: that Good Start was capable of reducing the risk of infant allergies; that sufficient scientific evidence supported its atopic-dermatitis claims; and that the FDA had endorsed these claims.

121.    Defendant knew these representations were false when made. Among other things, Defendant was aware of the Lowe study, which found no correlation between Good Start and allergy reduction; was aware that there was little support for its atopic-dermatitis claim; and was aware of the FDA's limited endorsement of its health claims.

122.    Defendant's misrepresentations were contained in national advertisements available to Plaintiff at the time they purchased Good Start. For example, among other things, Plaintiff relied on the magazine and television ads described above.

123.    As noted in detail above, these advertisements were false and misleading: among

other things, Good Start does not, in fact, reduce the risk of infant allergies, and Defendant's

atopic-dermatitis claims lack any qualifying language.

124.    Defendant had a duty to disclose that Good Start did not reduce the risk of infant

allergies, or that there was very little scientific evidence supporting this claim, and that the FDA

did not endorse Defendant's allergenic health claims.

125.    The aforementioned misrepresentation were material in that the allergenic

benefits of an infant formula would influence a reasonable consumer's (i.e., a parent's or

guardian's) decision as to whether or not to purchase that formula.

126.    Defendant intentionally made the above-mentioned misrepresentations with the

intent to deceive purchasers of Good Start, like Plaintiff, in order to boost sales.

127.    Plaintiff justifiably relied upon the misrepresentations made by Defendant, one of

this country's oldest and most recognizable baby-food manufacturers.

128.    As a result of her reliance, Plaintiff has been injured in an amount to be proven at

trial, including, but not limited to, the lost benefit of her bargain and overpayment at the time of

purchase.

129.    Defendant's conduct was knowing, intentional, with malice, demonstrated a

complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class

members. Plaintiff and the other Class members are therefore entitled to an award of punitive

damages.

**COUNT V**
**Negligent Misrepresentation**
**(on behalf of Plaintiff and the Nationwide Class)**

130.    Plaintiff realleges and incorporates the preceding paragraphs.

131.    As alleged above, Defendant misrepresented the allergenic benefits of Good Start,

31

and these purported benefits constituted a material fact; i.e.: a consumer's decision to purchase Good Start would be influenced by its purported allergenic benefits.

132.    Defendant's misrepresentations were made in the course of a business transaction (the advertisement, sale, and purchase of Good Start) in which both Plaintiff and Defendant have a pecuniary interest.

133.    Defendant knew or should have known that these representations were false or misleading and failed to exercise reasonable care in disseminating the information contained in its advertisements.

134.    Defendant intended that its representations would induce consumers like Plaintiff into purchasing Good Start.

135.    Plaintiff's injuries were proximately caused by Defendant's misrepresentations: Plaintiff viewed Defendant's advertisement prior to purchasing Good Start, and the allergenic benefits mentioned in the advertisements prompted her to purchase Good Start, as opposed to an alternative formula, or to pay an inflated price for Good Start. Had Plaintiff been aware of Defendant's misrepresentations, she would have been unwilling to purchase Good Start, or to purchase Good Start at its advertised price.

**COUNT VI**
**Unjust Enrichment**
**(on behalf of Plaintiff and the Nationwide Class)**

136.    Plaintiff realleges and incorporate the preceding paragraphs.

137.    Plaintiff conferred a benefit on Defendant in the amount of the premium—associated with Defendant's allergy-reduction and qualified-approval claims—that Defendant was able to charge for Good Start, among other things.

138.    Defendant consciously and voluntarily accepted this benefit.

139.    This benefit was not conferred gratuitously or officiously by Plaintiff.

140.    It would be unjust and inequitable for Defendant to retain the above-mentioned benefits. For example, Defendant was only able to charge a premium for Good Start by intentionally withholding information from Plaintiff, or otherwise misrepresenting Good Start's allergenic benefits.

**PRAYER FOR RELIEF**

Plaintiff, individually and on behalf of the Class members, prays for an Order:

a) determining this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure;

b) designating Plaintiff as the Class representative;

c) designating Plaintiff's counsel as counsel for the Class;

d) issuing proper notice to the Class at Defendant's expense;

e) awarding restitution and disgorgement of Defendant's revenues obtained by means of any wrongful act or practice to Plaintiff and the Class;

f) awarding actual, statutory, and punitive damages and interest to Plaintiff and the Class;

g) awarding reasonable attorneys' fees, costs, and expenses to the full extent the law permits to Plaintiff and the Class; and

h) for all other and further relief this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff and the Class members demand a trial by jury.

Date: January 6, 2017                           Respectfully submitted,

                                                 _/s/ Michael R. Reese_
                                                 Michael R. Reese
                                                 George V. Granade
                                                 **REESE LLP**

100 West 93rd Street, 16th Floor
New York, New York  10025
Telephone: (212) 643-0500
Facsimile:  (212) 253-4272
Email:  *mreese@reesellp.com*
          *ggrenade@reesellp.com*

Brett Cebulash
Kevin Landau
Miles Greaves
**TAUS, CEBULASH & LANDAU, LLP**
80 Maiden Lane, Suite 1204
New York, New York 10038
Telephone: (646) 873-7654
Facsimile: (212) 931-0703
Email: *bcebulash@tcllaw.com*
          *klandau@tcllaw.com*
          *mgreaves@tcllaw.com*

Shanon J. Carson
Shoshana Savett
E. Michele Drake
Sarah R. Schalman-Bergen
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, Pennsylvania  19103
Telephone: (215) 875-4656
Facsimile: (215) 875-4604
Email: *scarson@bm.net*
          *stsavett@bm.net*
          *emdrake@bm.net*
          *sschalman-bergen@bm.net*

John A. Yanchunis
Marisa Glassman
**MORGAN & MORGAN
COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 275-5275
Facsimile: (813) 222-4736
Email: *jyanchunis@forthepeople.com*
          *mglassman@forthepeople.com*

*Attorneys for Plaintiff*