UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------

JEREMY GREENE and CETARIA WILKERSON,
on behalf of themselves and all others similarly
situated,

                Plaintiffs,

        v.

GERBER PRODUCTS CO., d/b/a Nestlé Nutrition,
Nestlé Infant Nutrition or Nestlé Nutrition North
America,

                Defendant.

------------------------------------------------------------

WENDY MANEMEIT, on behalf of herself and all
others similarly situated,

                Plaintiff,

        v.

GERBER PRODUCTS CO., d/b/a Nestlé Nutrition,
Nestlé Infant Nutrition or Nestlé Nutrition North
America,

                Defendant.

------------------------------------------------------------

**MEMORANDUM & ORDER**
16-CV-1153 (MKB)

17-CV-93 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiffs Jeremy Greene and Cetaria Wilkerson (the "Greene Plaintiffs") commenced a

putative class action on behalf of themselves and all others similarly situated against Defendant

Gerber Products Co., doing business as Nestlé Nutrition, Nestlé Infant Nutrition or Nestlé

Nutrition North America on March 8, 2016. (Greene Compl., Docket Entry No. 1.) Several

months later, on January 6, 2017, Plaintiff Wendy Manemeit commenced a nearly identical

putative class action on behalf of herself and all others similarly situated, and against the same Defendant, Gerber Products Co. (Manemeit Compl., Docket Entry No. 1.)[1] The Greene Plaintiffs allege violations of (1) the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. §§ 1345.01 *et seq.* ("OCSPA"), (2) the Ohio Deceptive Trade Practices Act, Ohio Rev. Code Ann. §§ 4165.01 *et seq.* ("ODTPA"), and (3) the North Carolina Deceptive Trade Practices Act, N.C. Gen. Stat. Ann. §§ 75-1.1 *et seq.* ("NCDTPA"). (Greene Compl. ¶ 14.) Manemeit alleges violations of sections 349 and 350 of New York's General Business Law ("GBL"). (Manemeit Compl. ¶¶ 93–108.) Plaintiffs[2] also bring common-law claims for fraudulent concealment, intentional misrepresentation, negligent misrepresentation and unjust enrichment, based on Defendant's advertising and marketing of its "Good Start" line of infant formula (the "Infant Formula"). (Greene Compl. ¶ 14; Manemeit Compl. ¶ 14.) Plaintiffs allege that Defendant's advertising and marketing misrepresent that Defendant's Infant Formula reduces the risk that infants will develop allergies, and also misrepresent that the Infant Formula is the first and only infant formula that the Food and Drug Administration (the "FDA") endorses to reduce the risk of infants developing allergies. (Greene Compl. ¶¶ 2–3.) Plaintiffs seek actual, statutory and punitive damages, restitution and disgorgement, and injunctive relief. (Greene Compl. 38; Manemeit Compl. 33.)

Defendant moves to dismiss or stay the *Greene* action, only, pursuant to the primary

---

[1] The Court refers to the complaint in *Greene*, 16-CV-1153, as the "Greene Complaint," and to the complaint in *Manemeit*, 17-CV-93, as the "Manemeit Complaint." A separate class of plaintiffs from Wisconsin and Florida filed a nearly identical complaint against Defendant that is currently pending before this Court, is based on the same underlying facts and asserts similar claims under other state consumer protection laws. *See Hasemann v. Gerber Prods. Co.*, No. 15-CV-2995, 2016 WL 5477595 (E.D.N.Y. Sept. 28, 2016).

[2] The Court refers to the Greene and Manemeit Plaintiffs collectively as "Plaintiffs."

jurisdiction doctrine. Defendant also moves to dismiss Plaintiffs' claims for injunctive relief pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, strike the nationwide class allegations and dismiss the Greene Complaint and the Manemeit Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.[3]

The Court consolidates the *Greene* and *Manemeit* actions for purposes of deciding this motion. For the reasons set forth below, the Court declines to dismiss or stay the Greene Complaint pursuant to the primary jurisdiction doctrine, grants Defendant's motion to dismiss Plaintiffs' claims under the OCSPA and ODTPA, and denies Defendant's motion to dismiss Plaintiffs' claims under the NCDTPA. As to the Manemeit Complaint, the Court denies Defendant's motion to dismiss the claims brought pursuant to sections 349 and 350 of the GBL. As to the Greene and Manemeit Complaints, the Court finds that Plaintiffs lack standing to seek injunctive relief; grants Defendant's motion to dismiss the unjust enrichment claims; denies Defendant's motion to strike the nationwide class allegations; and denies Defendant's motion to dismiss the fraudulent concealment, intentional misrepresentation and negligent misrepresentation claims.

---

[3] (Def. Mot to Dismiss ("Def. Mot."), Docket Entry No. 22; Def. Mem. in Supp. of Def. Mot. ("Def. Mem."), Docket Entry No. 23; Decl. of Geoffrey Castello in Supp. of Def. Mot. ("Castello Decl."), Docket Entry No. 24; Def. Reply in Further Supp. of Def. Mot. ("Def. Reply"), Docket Entry No. 26; Manemeit Def. Mot to Dismiss ("Manemeit Def. Mot."), Docket Entry No. 18; Mem. in Supp. of Manemeit Def. Mot. ("Manemeit Def. Mem."), Docket Entry No. 19; Decl. of Geoffrey Castello in Supp. of Manemeit Def. Mot. ("Castello Decl. Manemeit Mot."), Docket Entry No. 20; Def. Reply in Further Supp. of Manemeit Def. Mot. ("Manemeit Def. Reply"), Docket Entry No. 22.)

## I. Background

The facts alleged in the Greene Complaint and Manemeit Complaint are assumed to be true for the purpose of this motion.[4]

### a. Defendant's applications to FDA

Since at least 2011, Defendant has manufactured, distributed and sold the Infant Formula, and has advertised the Infant Formula through television, print media, product labeling and on the Internet. (Greene Compl. ¶ 32.) The Infant Formula contains partially hydrolyzed whey protein, which is the ingredient that is purportedly responsible for the Infant Formula's ability to reduce the risk of developing allergies. (*Id.* ¶¶ 5, 8–9.)

In June of 2005, Defendant petitioned the FDA for approval of a qualified health claim[5] to use in its marketing of the Infant Formula. (*Id.* ¶ 40.) Defendant sought approval to state that "emerging clinical research in healthy infants with family history of allergy shows that feeding a

---

[4] Except as to the statutory claims in each, the Greene and Manemeit Complaints are nearly identical, and the same facts are set forth in each. The Court cites to the Greene Complaint for ease of reference.

[5] The FDA can approve a "health claim" or a "qualified health claim" under certain circumstances, allowing companies to make certain health claims about their products in the labeling of said products. A "health claim" is "any claim made on the label or in labeling of a food . . . that expressly or by implication . . . characterizes the relationship of any substance to a disease or health-related condition." (Greene Compl. ¶ 33 (quoting 21 C.F.R. § 101.14(a)(1)).) Before a health claim can be used in labeling a product, the FDA must review and approve any such health claim. (*Id.* ¶ 36.) The FDA can approve a health claim if it determines that there is "significant scientific agreement" that the claim is supported by scientific evidence. (*Id.* ¶ 34.) "In the absence of 'significant scientific agreement' [as to a health] claim, the FDA may nevertheless allow a company to make a 'qualified health claim' if it is supported by less scientific evidence." (*Id.* ¶ 35.) When the FDA permits a company to make a qualified health claim, the FDA issues "a letter outlining the circumstances under which it intends to consider exercising its enforcement discretion not to challenge the qualified health claim." (Def. Mem. 4); *see generally Fleminger, Inc. v. U.S. Dep't of Health & Human Servs.*, 854 F. Supp. 2d 192, 200 (D. Conn. 2012) (explaining the FDA's process for analyzing and approving qualified and unqualified health claims).

100% Whey-Protein Partially Hydrolyzed formula may reduce the risk of common food allergy symptoms, particularly allergic skin rash." (*Id.*) The FDA denied Defendant's petition on May 11, 2006, concluding that there was "no credible evidence to support the qualified health claim relating consumption of 100 percent partially hydrolyzed whey protein in infant formula to a reduced risk of food allergy." (*Id.* ¶ 41.)

In May of 2009, Defendant again petitioned the FDA to approve a qualified health claim, stating:

> emerging clinical research shows that, in healthy infants with family history of allergy, feeding a 100% Whey-Protein Partially Hydrolyzed infant formula instead of a formula containing intact cow's milk proteins may reduce the risk of developing the most common allergic disease of infancy — atopic dermatitis — throughout the 1st year of life and up to 3 years of age.

(*Id.* ¶ 42.) The FDA determined that this claim mischaracterized the scientific evidence and was therefore misleading. (*Id.* ¶ 43.) The FDA instead proposed four alternative qualified health claims, over which it would consider exercising its enforcement discretion not to challenge the qualified health claim.[6] (*Id.* ¶ 45.)

---

[6] The FDA proposed the following four alternative qualified health claims:
1. "Very little scientific evidence suggests that, for healthy infants who are not exclusively breastfed and who have a family history of allergy, feeding a 100% Whey-Protein Partially Hydrolyzed infant formula from birth up to 4 months of age instead of a formula containing intact cow's milk proteins may reduce the risk of developing atopic dermatitis throughout the 1st year of life and up to 3 years of age."
2. "Little scientific evidence suggests that, for healthy infants who are not exclusively breastfed and who have a family history of allergy, feeding a 100% Whey-Protein Partially Hydrolyzed infant formula from birth up to 4 months of age instead of a formula containing intact cow's milk proteins may reduce the risk of developing atopic dermatitis throughout the 1st year of life."
3. "For healthy infants who are not exclusively breastfed and who have a family history of allergy, feeding a 100% Whey-Protein

**b.   The alleged false and misleading representations**

Plaintiffs allege that, "since at least 2011," Defendant has marketed and advertised the

Infant Formula using false and misleading representations.  (*Id.* ¶ 55.)  Plaintiffs allege six

examples of the allegedly false and misleading representations: a statement on the seal of the

Infant Formula that it is the "1st & only routine formula to reduce the risk of developing

allergies," (*id.* ¶ 56 (capitalization omitted); Ex. C, annexed to Compl.); a statement on the label

of the Infant Formula that it is "the first and only formula brand made from 100% whey protein

hydrolyzed, and that meets the criteria for a FDA Qualified Health Claim for atopic dermatitis,"

(Compl. ¶¶ 57, 59; Ex. D, annexed to Compl.); a television commercial stating in relevant part:

"You want your Gerber baby to have your imagination . . . your smile . . . your eyes . . . not your

---

> Partially Hydrolyzed infant formula from birth up to 4 months of
> age instead of a formula containing intact cow's milk proteins may
> reduce the risk of developing atopic dermatitis throughout the 1st
> year of life and up to 3 years of age. FDA has concluded that the
> relationship between 100% Whey-Protein Partially Hydrolyzed
> infant formulas and the reduced risk of atopic dermatitis is
> uncertain, because there is very little scientific evidence for the
> relationship."
> 4. "For healthy infants who are not exclusively breastfed and who
> have a family history of allergy, feeding a 100% Whey-Protein
> Partially Hydrolyzed infant formula from birth up to 4 months of
> age instead of a formula containing intact cow's milk proteins may
> reduce the risk of developing atopic dermatitis throughout the 1st
> year of life. FDA has concluded that the relationship between
> 100% Whey-Protein Partially Hydrolyzed infant formulas and the
> reduced risk of atopic dermatitis is uncertain, because there is little
> scientific evidence for the relationship."

(Greene Compl. ¶ 45.)  In addition, the FDA explained that the use of any of the four claims
would have to be accompanied by the following statement:

> Partially hydrolyzed formulas **should not be fed to infants who
> are allergic to milk or to infants with existing milk allergy
> symptoms**.  If you suspect your baby is already allergic to milk, or
> if your baby is on a special formula for the treatment of allergy,
> your baby's care and feeding choices should be under a doctor's
> supervision.

(FDA Letter dated May 24, 2011 ("FDA 2011 Letter"), annexed to Castello Decl. as Ex. 1.)

allergies. . . . [I]f you introduce formula, choose the Gerber Good Start Comfort Proteins Advantage," (Compl. ¶ 60 (alterations in original); Ex. E, annexed to Compl.); a print advertisement stating:

> The Gerber Generation says "I love Mommy's eyes, not her allergies."
>
> If you have allergies in your family, breastfeeding your baby can help reduce their risk. And, if you decide to introduce formula, research shows the formula you first provide your baby may make a difference. In the case of Gerber® Good Start® Gentle Formula, it's the Comfort Proteins® Advantage that is easy to digest and may also deliver protective benefits.

(Compl. ¶ 61; Ex. F, annexed to Compl.); and two additional print advertisements stating that it is the "the first and only infant formula that meets the criteria for a FDA Qualified Health Claim." (Compl. ¶¶ 62–63; Ex. G, annexed to Compl.; Ex. H, annexed to Compl.)

According to Plaintiffs, these statements can be categorized as making two deceptive representations: (1) that the Infant Formula reduces the risk that infants will develop allergies, and (2) that the Infant Formula meets the criteria for an FDA qualified health claim for atopic dermatitis. As to the representation that the Infant Formula "reduce[s] the risk of [infants] developing allergies," Plaintiffs allege that it is false because the FDA rejected this claim in May 2006, and the scientific evidence demonstrates that this claim is false. (Compl. ¶¶ 56, 60.) In support of this argument, Plaintiffs allege that several scientific studies have concluded that partially hydrolyzed whey protein does not lower the risk that infants will develop allergies. (*Id.* ¶¶ 46–52.) Plaintiffs cite to a June of 2011 study by Adrian Lowe, Ph.D., University of Melbourne and Melbourne Royal Children's Hospital ("the Lowe Study"), which concluded that "[t]here was no evidence that introducing pHWF [(partially hydrolyzed whey formula)] at the cessation of breast-feeding reduced the risk of allergic manifestations, including eczema, asthma, and allergic rhinitis, in [a] study of high-risk infants." (*Id.* ¶ 47 (alterations in original) (quoting

Adrian J. Lowe, *Effect of a Partially Hydrolyzed Whey Infant Formula at Weaning on Risk of Allergic Disease in High-Risk Children: A Randomized Controlled Trial*, 128 J. Allergy & Clinical Immunology 2, 360–65 (2011)).)

As to the representation that the Infant Formula meets the criteria for an FDA qualified health claim for atopic dermatitis, Plaintiffs allege that this representation is deceptive because it "implies that the FDA fully endorsed Defendant's atopic-dermatitis claims, despite the fact that the FDA's endorsement was strictly reserved to claims indicating that there was 'little' or 'very little' evidence supporting the link between Good Start and atopic dermatitis." (*Id.* ¶ 57.) In addition, by not including the language of one of the four qualified health claims and by using the FDA term of art "qualified health claim" to suggest that the Infant Formula was endorsed by the FDA for a particular purpose, Defendant "falsely or misleadingly implied that Good Start would *unqualifiedly* reduce the risk of atopic determatitis." (*Id.* ¶¶ 57–58.)

### c. FDA warning letter

On October 31, 2014, the FDA sent a warning letter to Defendant's President and CEO "outlining various false and misleading representations made in the promotion of [the Infant Formula]" (the "FDA Warning Letter"). (*Id.* ¶ 68.) After reviewing the labeling on the Infant Formula that was sold as a 23.2 ounce milk-based powder, the FDA concluded that the labeling on the Infant Formula bore "health claims that were not authorized by FDA" and that "the labeling [was] misleading."[7] (FDA Warning Letter 1, annexed to Castello Decl. as Ex. 3.) The

---

[7] Because both complaints cite to and quote extensively from the FDA Warning Letter, (*see* Compl. ¶¶ 68–71), the Court finds that the letter is incorporated by reference into the Greene Complaint and the Manemeit Complaint. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 112 (2d Cir. 2010) (noting that because the plaintiff referred in the complaint to certain e-mails, "the District Court could deem them incorporated in the complaint and therefore subject to consideration" on a 12(b)(6) motion); *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 123 (S.D.N.Y. 2010) ("To be incorporated by reference, the complaint must

FDA also noted that it had "previously considered and denied" the statement on the label of the Infant Formula that it was the "1st & only routine formula to reduce risk of developing allergies." (*Id.* at 2 (capitalization omitted).) The FDA acknowledged that consistent with the FDA's four proposed qualified health claims, Defendant's labeling and website both stated that there was "limited evidence" that partially hydrolyzed whey protein can reduce the risk of infants developing atopic dermatitis, (*id.* at 2–3), but nevertheless concluded that by failing to include the qualifying statement about the infants with existing milk allergies, as required by the FDA, Defendant failed to provide "essential information necessary to ensure the safety of consumers," (*id.* at 3–4). Because Defendant failed to include the qualifying statement on its website or on the labeling of the Infant Formula, the FDA concluded that Defendant's qualified health claim was misleading. (*Id.*)

### d. Litigation involving Defendant

On October 29, 2014, the Federal Trade Commission (the "FTC") filed a lawsuit against Defendant in the United States District Court for the District of New Jersey, alleging that the Product's labeling and advertising are false and deceptive (the "FTC Litigation"). (Compl. ¶ 66.); *Fed. Trade Comm'n v. Gerber Prods. Co.*, No. 14-CV-6771 (D.N.J. Oct. 29, 2014). The FTC alleged that Defendant's representation that the Infant Formula reduces the risk of developing allergies is false or misleading and unsubstantiated. (*Id.* ¶ 67); *Fed. Trade Comm'n v. Gerber*, complaint at ¶¶ 19–20. The FTC also alleged that Defendant's representation on the

---

make 'a clear, definite and substantial reference to the documents.'" (quoting *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330–31 (S.D.N.Y. 2003))) The Court also finds that because Plaintiffs repeatedly rely on the FDA Warning Letter in alleging their claims, the letter is integral to the Greene Complaint and the Manemeit Complaint. *See Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) ("A document is integral to the complaint 'where the complaint relies heavily upon its terms and effect.'" (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002))).

labeling and in its advertising that the Infant Formula qualified for or received approval for a health claim from the FDA is false or misleading. (Compl. ¶ 67); *Fed. Trade Comm'n v. Gerber*, complaint at ¶¶ 22–23.

Since the FTC filed its action against Defendant, four other cases regarding the Infant Formula have been filed against Defendant. (Greene Pls. Mem. of Law in Opp'n to Def. Mot. ("Pls. Opp'n") 5–6, Docket Entry No. 24; Def. Mem. 1); *see also Hasemann v. Gerber Prods. Co.*, No. 15-CV-2995, 2016 WL 5477595 (E.D.N.Y. Sept. 28, 2016); *Slocum v. Gerber Prods. Co.*, No. 16-CV-4120 (W.D. Mo. Mar. 14, 2016); *Zakaria v. Gerber Prods. Co.*, No. 15-CV-200, 2015 WL 3827654 (C.D. Cal. June 18, 2015); *Nat'l Consumers League v. Gerber Prods. Co.*, No. 14-CA-8202 (D.C. Super. Ct. Aug. 8, 2015). In all four cases the plaintiffs allege that Defendant's representations that the Infant Formula reduces the risk of developing allergies and their representations that the FDA approved Defendant's health claims are false and misleading, respectively. *See Hasemann*, No. 15-CV-2995, complaint at ¶¶ 42–53; *Zakaria*, 2015 WL 3827654, at *1; *Nat'l Consumers League*, slip op. at 3.[8]

### e. Plaintiffs' purchases

Plaintiffs allege that they reviewed the representations on the label of the Infant Formula and on Defendant's website stating that the Infant Formula reduces the risk that infants will develop allergies and that the FDA has endorsed Defendant's qualified health claim. (Compl. ¶¶ 72–74; Manemeit Compl. ¶¶ 72–25.) Based on these representations, Plaintiffs purchased the Infant Formula in "canisters" for $18 in Ohio; for between $16 and $22 in North Carolina; and

---

[8] The courts in both *Zakaria* and *Nat'l Consumers League* denied Defendant's motions to dismiss the complaints in those actions. *See Zakaria*, 2015 WL 3827654, at *2; *Nat'l Consumers League*, slip op. at 1. *Slocum* has been remanded to state court in Missouri. In *Hasemann*, which is before the Court, Defendant moved to dismiss the complaint. The Court granted the motion in part and denied it in part on September 28, 2016. *See Hasemann*, 2016 WL 5477595, at *1.

for $25 in New York.  (Compl. ¶¶ 72–74; Manemeit Compl. ¶ 72.)  According to Plaintiffs, Defendant "inflated" the price of the Infant Formula by approximately forty-one percent based on its false and misleading representations.  (Compl. ¶ 77; Manemeit Compl. ¶ 77.)  Plaintiffs assert that they would not have paid "these inflated prices" had they known that the Infant Formula does not reduce the risk that infants will develop allergies or that the FDA did not endorse Defendant's qualified health claim.  (Compl. ¶ 78; Manemeit Compl. ¶ 79.)

### f.  Proposed classes

Plaintiff Greene asserts his claims on behalf of a class of persons who purchased the Infant Formula in the state of Ohio from May 15, 2011 to the present (the "Ohio Class").  (Compl. ¶ 79.)  Plaintiff Wilkerson asserts her claims on behalf of a class of persons who purchased the Infant Formula in the state of North Carolina from May 15, 2011 to the present (the "North Carolina Class").  (*Id.* ¶ 80.)  Plaintiff Manemeit asserts her claims on behalf of a class of persons who purchased the Infant Formula in the state of New York from May 15, 2011 to the present.  (Manemeit Compl. ¶ 80.)  Plaintiffs collectively bring claims on behalf of all persons who purchased the Infant Formula in the United States from May 15, 2011 to the present (the "Nationwide Class").  (*Id.* ¶ 81; Compl. ¶ 81.)

## II.  Discussion

### a.  Standards of review

#### i.  Rule 12(b)(1)

A district court may dismiss an action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) when the court "lacks the statutory or constitutional power to adjudicate it." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)); *Shabaj v. Holder*,

718 F.3d 48, 50 (2d Cir. 2013) (quoting *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005)). The plaintiff has the burden to prove that subject matter jurisdiction exists, and in evaluating whether the plaintiff has met that burden, "'[t]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff,' but 'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'" *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citations omitted), *aff'd*, 561 U.S. 247 (2010). A court may consider matters outside of the pleadings when determining whether subject matter jurisdiction exists. *M.E.S., Inc. v. Snell*, 712 F.3d 666, 671 (2d Cir. 2013); *Romano v. Kazacos*, 609 F.3d 512, 520 (2d Cir. 2010).

### ii. Rule 12(b)(6)

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must construe the complaint liberally, "accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Concord Assocs., L.P. v. Entm't Prop. Trust*, 817 F.3d 46, 52 (2d Cir. 2016) (quoting *Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)); *see also Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (quoting *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997)). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717–18

(2d Cir. 2013). Although all allegations contained in the complaint are assumed true, this principle is "inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

### iii.   Rule 12(f)

Rule 12(f) of the Federal Rules of Civil Procedure provides that a court may "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter" *sua sponte* or "on motion made by a party." Fed. R. Civ. P. 12(f); *see also Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 511 (S.D.N.Y. 2015) (applying same). Rule 23(c)(1)(A) of the Federal Rules of Civil Procedure "calls for a determination of 'whether to certify the action as a class action' at 'an early practicable time after a person sues . . . as a class representative.'" *See id.* at 511 (internal quotation marks omitted) (quoting *Emilio v. Spring Spectrum L.P.*, 68 F. Supp. 3d 509, 514 (S.D.N.Y. 2014)). To succeed on a motion to strike class allegations, a defendant must "demonstrate from the face of the complaint that it would be impossible to certify the alleged class regardless of the facts the plaintiffs may be able to obtain during discovery." *Mayfield v. Asta Funding*, 95 F. Supp. 3d 685, 696 (S.D.N.Y. 2015) (alterations omitted); *cf. Calibuso v. Bank of Am. Corp.*, 893 F. Supp. 2d 374, 388 (E.D.N.Y. 2012) ("[T]he court finds that . . . it would be futile to allow [the] plaintiffs to conduct discovery because plaintiff's theory for class certification is simply foreclosed.").

"Motions to strike under Rule 12(f) are rarely successful." *Reynolds*, 136 F. Supp. 3d at 511; *see also Belfiore v. Procter & Gamble Co.*, 94 F. Supp. 3d 440, 447 (E.D.N.Y. 2015) ("Courts rarely grant motions to strike pursuant to [Rule] 12(f)."); *Emilio*, 68 F. Supp. 3d at 514 ("Motions to strike are viewed with disfavor and infrequently granted." (alterations and internal quotation marks omitted)). This is particularly true in the class-action context because a Rule

12(f) motion "requires a reviewing court to preemptively terminate the class aspects of litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification." *Belfiore*, 94 F. Supp. 3d at 447 (internal quotation marks omitted); *see also Emilio*, 68 F. Supp. 3d at 514 (same). As a result, "district courts in this Circuit have frequently found that a determination of whether Rule 23 requirements are met is more properly deferred to the class certification stage," when the court has before it a more complete factual record from which to make its determination. *Mazzola v. Roomster Corp.*, 849 F. Supp. 2d 395, 410 (S.D.N.Y. 2012). Stated differently, "motions to strike class allegations are often denied as premature." *Reynolds*, 136 F. Supp. 3d at 511; *Chen–Oster v. Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012) ("Generally speaking . . . motions [to strike class allegations] are deemed procedurally premature."); *cf. Pilgrim v. Univ. Health Card, LLC*, 660 F.3d 943, 949 (6th Cir. 2011) ("It is only when no amount of discovery or time will allow for plaintiffs to resolve deficiencies in class definitions under Rule 23, that a motion to strike class allegations should be granted."). However, when a motion to strike "addresses issues separate and apart from the issues that will be decided on a class certification motion," the motion to strike may not be premature. *Chen–Oster*, 877 F. Supp. 2d at 117 (internal quotation marks omitted).

### b. Primary jurisdiction doctrine

Defendant moves pursuant to the primary jurisdiction doctrine to either dismiss or stay the *Greene* action pending resolution of the FTC Litigation. (Def. Mem. 2.) Defendant argues that the FDA has promulgated "a complex and comprehensive regulatory scheme governing misbrand, and food and beverage labeling in particular," and that the FTC and FDA are both in a "far better position" to determine whether Defendant's representations are "improper." (*Id.* at

18, 19.)  The Greene Plaintiffs argue that the primary jurisdiction doctrine is inapplicable here because the FTC Litigation does not involve technical issues within the agency's specialty and there is little risk that the FDA will issue guidance that conflicts with the current case.  (Pls. Opp'n 20.)  The Greene Plaintiffs also argue that the Court already rejected the primary-jurisdiction argument in its earlier decision in *Hasemann*, 2016 WL 5477595.  (*Id.* at 19.)

The Court decided the applicability of the primary jurisdiction doctrine to identical facts in *Hasemann*.  In that case, as here, Defendant argued that the action should be dismissed or stayed pending the outcome of the FTC Litigation because the FTC and the FDA were in a "far better position" to determine whether Defendant's misrepresentations were "improper." *Hasemann*, 2016 WL 5477595, at *5.  In weighing the factors relevant to the primary jurisdiction doctrine in *Hasemann*, the Court determined that "only the fact that the FDA has discretion to regulate the Infant Formula weighs in favor of applying the primary jurisdiction doctrine, and this factor alone is insufficient to support such an outcome." *Id.* at *7.  Thus, for the reasons set forth in *Hasemann*, the Court denies Defendant's motion to dismiss or stay the *Greene* action pursuant to the primary jurisdiction doctrine.  *See id.* at *5–7.

      **c.   Standing to seek injunctive relief**

Defendant argues that Plaintiffs are not entitled to injunctive relief because they fail to allege that they will purchase the Infant Formula in the future, and therefore fail to allege a likelihood of continuing or future injury.  (Def. Mem. 20.)  Plaintiffs argue that they have third-party standing, which enables them to sue to enjoin Defendant's false advertising practices even

if they "lack individual standing to seek injunctive relief for [Defendant's] misleading advertising."[9] (Pls. Opp'n Mem. 21.)

As the Court explained in *Hasemann*, a plaintiff seeking injunctive relief "must show the three familiar elements of standing: injury in fact, causation, and redressability." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). "[T]o meet the constitutional minimum of standing" for injunctive relief, a plaintiff "must carry the burden of establishing that 'he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.'" *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–102 (1983)); *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) ("Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury." (first citing *Lyons*, 461 U.S. at 111–12; and then citing *Shain*, 356 F.3d at 215–16)); *Pungitore v. Barbera*, 506 F. App'x 40, 41 (2d Cir. 2012) ("[W]hen seeking prospective injunctive relief, the plaintiff must prove the likelihood of *future* or *continuing* harm."). The alleged injury "must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 383 (2d Cir. 2015) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. ---, ---, 134 S. Ct. 2334, 2341 (2014)); *Am.*

---

[9] In *Hasemann*, this Court observed that the Second Circuit has not directly addressed whether plaintiffs bringing claims of false or misleading advertising have standing to seek prospective injunctive relief when the challenged action is still ongoing but there is no threat of repeated injury to the plaintiffs. *See Hasemann*, 2016 WL 5477595, at *8. The Court concluded, however, that "the requirement that a plaintiff allege a risk of future injury in order to obtain injunctive relief is a constitutional requirement that all plaintiffs must satisfy." *Id.* at *9 (citing *Lyons*, 461 U.S. at 102). Because the *Hasemann* plaintiffs did not allege and could not show that they continued to purchase the Infant Formula at that time or that they would purchase the Infant Formula in the future, they failed to allege a risk of future injury and therefore lacked standing to seek injunctive relief. *See id.*

*Civil Liberties Union v. Clapper*, 785 F.3d 787, 800 (2d Cir. 2015) ("The Supreme Court has 'repeatedly reiterated that "threatened injury must be *certainly impending* to constitute injury in fact," and that "[a]llegations of *possible* future injury" are not sufficient.'" (alteration in original) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. ---, ---, 133 S. Ct. 1138, 1147 (2013))).

A plaintiff "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he . . . will be injured in the future." *Shain*, 356 F.3d at 215; *see also Nicosia*, 834 F.3d at 239 (stating that past injuries do not confer standing to seek injunctive relief); *Pungitore*, 506 F. App'x at 42 (stating that, while past wrongs may be "evidence bearing on whether there is a real and immediate threat of repeated injury,' such evidence 'does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects'" (quoting *Lyons*, 461 U.S. at 102)). "In establishing a certainly impending future injury, . . . the plaintiff must establish how he or she will be injured prospectively and that the injury would be prevented by the equitable relief sought." *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012) (collecting cases). "[A]t the pleading stage, standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury." *Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

Although the Supreme Court has "adhered to the rule that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties,'" this rule is not absolute, and "there may be circumstances where it is necessary to grant a third party standing to assert the rights of another." *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). These circumstances are "well-recognized, prudential exceptions to the 'injury-in-fact' requirement"

that "permit third-party standing where the plaintiff can demonstrate (1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 109–10 (2d Cir. 2008) (citing *Kowalski*, 543 U.S. at 130); *see also Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 174 (2d Cir. 2005) ("[A] plaintiff seeking third-party standing in federal court must . . . demonstrat[e] a close relation to the injured third party and a hindrance to that party's ability to protect its own interests." (internal quotation marks omitted)); *cf. Camacho v. Brandon*, 317 F.3d 153, 159 (2d Cir. 2003) ("A plaintiff may assert the *constitutional* claims of a third party if the plaintiff can demonstrate: (1) injury to the plaintiff, (2) a close relationship between the plaintiff and the third party that would cause plaintiff to be an effective advocate for the third party's rights, and (3) 'some hindrance to the third party's ability to protect his or her own interests.'" (emphasis added) (quoting *Campbell v. Louisiana*, 523 U.S. 392, 397 (1998))). Thus, courts "historically have permitted trustees to bring suits to benefit their trusts; guardians at litem to bring suits to benefit their wards; receivers to bring suit to benefit their receiverships; assignees in bankruptcy to bring suits to benefit bankrupt estates; and executors to bring suit to benefit testator estates." *W.R. Huff*, 549 F.3d at 110 (alterations, citations and internal quotation marks omitted); *see also Smith v. Org. of Foster Families for Equality & Reform*, 431 U.S. 816, 841 n.44 (1977) (recognizing third-party standing for foster parents to raise due process claims on behalf of foster children).

The Supreme Court has "been quite forgiving with these criteria in certain circumstances," as in the context of the First Amendment or in allowing parties to litigate the rights of third parties "when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." *Kowalski*, 543 U.S. at 130 (collecting

cases, including *Doe v. Bolton*, 410 U.S. 179 (1973); *Griswold v. Connecticut*, 381 U.S. 49 (1965); and *Barrows v. Jackson*, 346 U.S. 249 (1953)). In general, the Court has "permitted third-party standing only where more 'daunting' barriers deterred the rightholder." *Miller v. Albright*, 523 U.S. 420, 449–50 (1998) (citing *Powers v. Ohio*, 499 U.S. 400 (1991) (criminal defendant challenging exercise of peremptory challenges on behalf of potential jurors); *Hotel v. Irving*, 481 U.S. 704 (1987) (litigants asserting the rights of their deceased parents); *Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977) (vendor challenging law prohibiting distribution of contraception to minors)). The Supreme Court has also accorded third-party standing "[w]here insurmountable procedural obstacles preclude a rightholder's own suit." *Kowalski*, 543 U.S. at 130 (citing *Singleton v. Wulff*, 428 U.S. 106 (1976) (physician asserting the rights of women seeking an abortion where privacy may deter women from bringing suit and their "claim[s] will soon become at least technically moot" if they are forced to forgo the abortion); *Craig v. Boren*, 429 U.S. 190 (1976) (alcohol vendor asserting equal protection challenge on behalf of 18-to-20-year-old males affected by beer-sale restriction where some males in class would have claims mooted by aging out of restriction)).

"Beyond these examples," however, the Supreme Court "ha[s] not looked favorably upon third-party standing." *Kowalski*, 543 U.S. at 130 (citing *Conn v. Gabbert*, 526 U.S. 286 (1999) (rejecting an attorney's attempt to adjudicate the rights of a client)). To the extent that the Supreme Court's exceptions to classic standing doctrine rest on a unifying principle, the analytical distinction seems to be "between claims asserting private interests and those asserting public interests." *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 67 (2d Cir. 2012) (Hall, J., concurring). This is because "[w]hen private rights are involved, it is easy to understand that one person cannot seek to recover on a claim that belongs to someone else"; however, "when a party

properly in court seeks to sustain its own opposition to a *public act* by invoking the interests of others," courts will occasionally allow the party to do so. *Id.* (quoting Charles Alan Wright et al., Fed. Practice & Proc. § 3531.9 (3d ed. 2011)); *see also Barrows*, 346 U.S. at 257 (permitting third-party standing to challenge racially restrictive covenant because "the reasons which underlie [the] rule denying standing to raise another's rights" were "outweighed by the need to protect the fundamental rights" that otherwise would have been denied).

Here, Plaintiffs cannot assert third-party standing "on behalf of individuals who are not yet aware that Gerber's advertisements are false," (Manemeit Pl. Mem. in Opp'n to Manemeit Def. Mot. ("Manemeit Opp'n") 23, Docket Entry No. 21). The Court acknowledges the persuasive value of Plaintiffs' argument that, without third-party standing, consumers could not enjoin false or deceptive advertising because (1) if they were unaware of the falsity of the advertising and therefore at risk of future injury, they would not bring suit, and (2) once they become aware that a product is falsely or deceptively advertised, they cannot plausibly allege that they would re-purchase the product. (Manemeit Opp'n Mem. 24.)

However, the relationship between a class representative and would-be consumers "is not the type of close relationship courts have recognized as creating a 'prudential exception' to the third-party standing rules." *See W.R. Huff*, 549 F.3d at 110 (holding that an investment manager to whom investor-clients had given power-of-attorney and authority over investment decisions lacked standing to file a security fraud claim on the clients' behalf). In fact, the Supreme Court has made clear that it does "not look[] favorably upon third-party standing" except in certain circumstances when the challenged conduct would indirectly violate a third party's rights even if it were merely enforced against the primary litigant. *Kowalski*, 543 U.S. at 130.

In general, the Supreme Court's concern appears to be that "where a hindrance impedes the assertion of a claim, the right likely will not be asserted — and thus the relevant law will not be enforced — unless the Court recognizes third-party standing." *Miller*, 523 U.S. at 450. In practice, almost without exception, the Supreme Court allows third-party standing only to preserve the constitutional rights of third parties who are unable to challenge the infringement of those rights. *See id.* (discussing specific examples of third-party standing); *see also Am. Psych. Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 358 (2d Cir. 2016) (explaining that "a physician or other professional may raise the *constitutional* rights, but generally not the statutory rights, of his or her patients")

No constitutional rights are at risk here, Plaintiffs are adequately able to vindicate their own rights by seeking damages, and there is no risk that "the relevant law will not be enforced" if Plaintiffs are not able to seek prospective injunctive relief on behalf of a nebulous class of would-be Gerber consumers. *See Miller*, 523 U.S. at 450. Basically, the injunctive relief Plaintiffs seek would not remedy the injury Plaintiffs allege they suffered, and the alleged injuries of would-be consumers are not sufficient to confer standing on Plaintiffs *See W.R. Huff*, 549 F.3d at 110 (denying third-party standing where "[t]he remedies sought in the complaint . . . would not redress either [of] the alleged injur[ies]"); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot boostrap a plaintiff into federal court.").

Moreover, Plaintiffs have not demonstrated that the unidentified class of would-be consumers would *likely* be harmed. A speculative, outside possibility of harm is insufficient to confer standing even on the group that Plaintiffs contend would be affected by Defendant's ongoing deceptive advertising. *See Nicosia*, 834 F.3d at 239 ("Plaintiffs lack standing to pursue

injunctive relief where they are unable to establish a 'real or immediate threat' of injury." (quoting *Lyons*, 461 U.S. at 111–12)); *Knife Rights, Inc.*, 802 F.3d at 383 (holding that the alleged injury "must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical'" (citation omitted)).  Plaintiffs make no allegations that the unidentified group on whose behalf they assert standing would be exposed to the same advertising, rely on it, or purchase the Infant Formula as a result.  As the Supreme Court has made clear, where a plaintiff's standing is at issue, the Court is not at liberty to make inferences in the plaintiff's favor.  *Spokeo, Inc. v. Robins*, 578 U.S. ---, ---, 136 S. Ct. 1540, 1547 (May 16, 2016) ("Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element of standing." (citations and internal quotation marks omitted)); *see also Warth*, 422 U.S. at 518 ("It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers."); *Morrison*, 547 F.3d at 170 ("Jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.").  The Court therefore finds that Plaintiffs lack standing to enjoin Defendants' alleged conduct.

### d.   Ohio statutory claims

#### i.   OCSPA

In count one of the Greene Complaint, the Greene Plaintiffs allege that Defendant's false and misleading advertising constituted an "unfair or deceptive act or practice" under the OCSPA because Defendant falsely claimed that the Infant Formula reduced the risk of an infant developing certain allergies, which ascribed to the Infant Formula performance characteristics and benefits that it did not possess, and because Defendant misleadingly suggested that the FDA

had unqualifiedly approved of Defendant's atopic-dermatitis claim, which ascribed to the Infant Formula a particular standard, quality or grade that it did not possess. (Compl. ¶ 97.)

Defendant argues that the Court should dismiss the Greene Plaintiffs' class action claim under the OCSPA because the Greene Plaintiffs did not allege, as the OCSPA requires, "that [Defendant] had prior notice that its conduct was 'deceptive or unconscionable.'" (Def. Mem. 12.) The Greene Plaintiffs argue that the OCSPA's notice requirements are preempted by Rule 23 of the Federal Rules of Civil Procedure, and that, in any event, the Greene Plaintiffs have met the OCSPA's requirements. (Pls. Opp'n 10–12.) The Greene Plaintiffs alternatively argue that Defendant was on notice that the OCSPA prohibits false or misleading allergy claims because the state attorney general, pursuant to her authority under the OCSPA, has promulgated rules that prohibit individuals or companies from making "any representations" that lack "a reasonable basis in fact" and has made publicly available several consent decrees with companies that made unsubstantiated health claims. (*Id.* at 12.)

The OCSPA prohibits suppliers from engaging in either unfair or deceptive consumer sales practices or unconscionable acts or practices as set forth in the Ohio Revised Code ("ORC") sections 1345.02 and 1345.03. As relevant here, the OCSPA defines as "deceptive" any act or practice that represents "[t]hat the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses or benefits that it does not have," ORC § 1345.02(B)(1); "[t]hat the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not," *id.* § 1345.02(B)(2); or "[t]hat the supplier has a sponsorship, approval, or affiliation that the supplier does not have," *id.* § 1345.02(B)(9). The OCSPA states that in determining whether an act or practice is "unconscionable," a court should take into account several factors, including whether the supplier "knew at the time the consumer

transaction was entered into" either that "the price was substantially in excess of the price at which similar property or services were readily obtainable in similar consumer transactions by like consumers," *id.* § 1345.03(B)(2), or that the consumer would be unable "to receive a substantial benefit from the subject of the consumer transaction," *id.* § 1345.03(B)(3).  In general, the OCSPA "defines 'unfair or deceptive consumer sales practices' as those that mislead consumers about the nature of the product they are receiving, while 'unconscionable acts or practices' relate to a supplier manipulating a consumer's understanding of the nature of the transaction at issue." *McKinney v. Bayer Corp.*, 744 F. Supp. 2d 733, 743 (N.D. Ohio 2010) (quoting *Whitaker v. M.T. Automotive, Inc.*, 855 N.E.2d 825, 829 (Ohio 2006)).

Although the OCSPA permits both individual and class action claims, *see* ORC § 1345.09, a consumer can assert a class action claim under the OCSPA "only if the defendant's alleged violation of the Act is substantially similar to an act or practice previously declared to be deceptive by one of the methods identified in" ORC § 1345.09(B).  *See McKinney*, 744 F. Supp. 2d at 743; *see also Marrone v. Philip Morris USA, Inc.*, 850 N.E.2d 31, 33 (Ohio 2006).  Under ORC § 1345.09(B), a consumer "may qualify for a class action only when a supplier acted in the face of prior notice that its conduct was deceptive or unconscionable." *Philip Morris USA*, 850 N.E.2d at 34.  The notice must be in the form of (1) "an act or practice declared to be deceptive or unconscionable by a rule adopted [by the Ohio Attorney General]" or (2) "an act or practice determined by [an Ohio state court] to violate [the OCSPA] and committed after the decision containing the determination has been made available for public inspection."  ORC § 1345.09(B); *McKinney*, 744 F. Supp. 2d at 743; *Philip Morris USA*, 850 N.E.2d at 33–34.  "Lack of prior notice requires dismissal of class action allegations." *St. Clair v. Kroger Co.*, 581 F. Supp. 2d 896, 901 (N.D. Ohio 2008); *see also City of Findlay v. Hotels.com, L.P.*, 444 F.

Supp. 2d 855, 863 (N.D. Ohio 2006) (finding that "the City cannot bring an OCSPA class action claim because the two prerequisites set forth in [ORC § 1345.09(B)] have not been alleged"); *Volbers–Klarich v. Middletown Mgmt., Inc.*, 929 N.E.2d 434, 441 (Ohio 2010) (holding that "appellant's claim seeking certification of a class action alleging a violation of the OCSPA fails to state a claim upon which relief can be granted" because the complaint did not "satisfy the notice requirement" of ORC § 1345.09(B)).

The Court considers whether Rule 23 preempts the OCSPA notice requirement and, if not, whether the Greene Plaintiffs have met the OCSPA notice requirement.

### 1. Rule 23 and the OCSPA

The Greene Plaintiffs argue that the Supreme Court's decision in *Shady Grove Orthopedic Ass'n, P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010) abrogates the OCSPA's notice requirement because the notice requirement conflicts with Rule 23 of the Federal Rules of Civil Procedure. (Pls. Opp'n 10–11.) Defendant argues that most courts to consider the issue have found that because the OCSPA's notice requirement is a substantive requirement, Rule 23 does not preempt the notice requirement. (Def. Reply 4.)

In *Shady Grove*, the Supreme Court addressed whether Rule 23, which governs class actions, conflicted with New York Civil Practice Law section 901(b) ("section 901(b)"), which precludes class actions seeking penalties or statutory minimum damages. *Shady Grove*, 559 U.S. at 399. A majority of the Court agreed that state class action provisions directly conflict with Rule 23, but the Court split on when Rule 23 preempts a conflicting state class action provision. *Id.* at 402–04. The plurality opinion found that Rule 23 preempts all state class action provisions, and that "the substantive nature of New York's law, or its substantive purpose, *makes no difference*. A Federal Rule of Procedure is not valid in some jurisdictions and invalid in

25

others — or valid in some cases and invalid in others — depending upon whether its effect is to frustrate a substantive state law (or a state procedural law enacted for substantive purposes)." *Id.* at 409. Justice Stevens concurred in the narrow holding that Rule 23 and section 901(b) conflict, but agreed with the four-Justice dissent that "there are some state procedural rules that federal courts must apply in diversity cases because they function as part of the State's definition of substantive rights and remedies." *Id.* at 423 (Stevens, J., concurring in part and concurring in judgment). Justice Stevens wrote a separate opinion holding that "[a] federal rule . . . cannot govern a particular case in which the rule would displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right." *Id.* To avoid such a result, Justice Stevens concluded that "[w]hen a federal rule appears to abridge, enlarge or modify a substantive right, federal courts must consider whether the rule can reasonably be interpreted to avoid that impermissible result." *Id.*

The Greene Plaintiffs argue that the restrictions on class actions under section 1345.09(B) of the OCSPA are not applicable in federal court after *Shady Grove* because the restrictions conflict with Rule 23. In particular, the Greene Plaintiffs contend that the plurality opinion controls, and therefore *Shady Grove* stands for the proposition that any state law restricting class actions in federal court is invalid. (Pls. Opp'n 10–11.) As explained below, the Court disagrees.

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2d Cir. 2003) (quoting *Marks v. United States*, 430 U.S. 188, 193 (1977)). This rule applies where "one opinion can meaningfully be regarded as

'narrower' than another — only when one opinion is a logical subset of other, broader opinions."

*Id.* (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc)).  When the narrowest

opinion is not "the common denominator representing the position approved by at least five

justices," — that is, when "it is not possible to discover a single standard that legitimately

constitutes the narrowest ground for a decision on that issue, there is then no law of the land

because no one standard commands the support of a majority of the Supreme Court."  *Id.*; *see*

*Leonard v. Abbott Labs., Inc.*, No. 10-CV-4676, 2012 WL 764199, at *12 (E.D.N.Y. Mar. 5,

2012) (quoting *Alcan Aluminum*, 315 F.3d at 189).

The Second Circuit has not directly addressed whether Justice Stevens' opinion controls.

*See Retained Realty, Inc. v. McCabe*, 376 F. App'x 52, 55 (2d Cir. 2010) (noting that the

decision in *Shady Grove* "does not set forth a single test" that governs when a Federal Rule

supersedes a state rule).  However, the Court agrees with the majority of district and circuit

courts that have found Justice Stevens' concurring opinion controls because it provides the

"narrowest grounds" or the "common denominator" of the majority position.  *See Abbott Labs.*,

2012 WL 764199, at *12 (collecting cases); *Phillips v. Phillips Morris Cos. Inc.*, 290 F.R.D. 476,

479–80 (N.D. Ohio 2013) ("[A] clear majority of courts have applied Stevens's narrower holding

as the controlling opinion for use in determining whether a federal rule may displace a

conflicting state law." (collecting cases)); *Kline v. Mortg. Elec. Sec. Sys.*, No. 08-CV-408, 2010

WL 6298271, at *3 (S.D. Ohio Dec. 30, 2010) (noting that the district courts faced with this

issue in Ohio "have concluded unanimously 'that Justice Stevens' concurrence . . . is the

controlling opinion by which [they are] bound.'" (quoting *McKinney*, 744 F. Supp. at 747)); *In re*

*Wellbutrin XL Antitrust Litig.*, 756 F. Supp. 2d 670, 675 (E.D. Pa. 2010) (finding that Justice

Stevens' concurrence controlled because "although he found Rule 23 to conflict with [section]

901(b) along with the plurality, Judge Stevens' Rules Enabling Act analysis called for an analysis of the state's substantive rights and remedies that was consistent with the approach of the four members of the dissent"); *see also James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1217 (10th Cir. 2011) ("Justice Stevens concurred, and the Tenth Circuit has understood his concurrence to be the controlling opinion in *Shady Grove*."); *Godin v. Schencks*, 629 F.3d 79, 84 (1st Cir. 2010) (relying on Justice Stevens' concurrence to hold that a state statute was "so intertwined with a state right or remedy" that it could not be displaced by a Federal Rule of Civil Procedure).

Although the Greene Plaintiffs do not address whether the class action notice prerequisite in the OCSPA is "intertwined" with the substantive right afforded by the statute, "every court in Ohio to address this issue has held that section 1345.09(B) is substantive in nature and therefore not preempted by Rule 23." *Leonard*, 2012 WL 764199, at *13. This is because section 1345.09(B) "is not a pan-substantive rule that applies to federal claims or to claims based on other states' laws. Rather, it applies only to 'a violation of Chapter 1345 of the [ORC]' — indicating its substantive nature." *In re Whirlpool Corp. FrontLoading Washer Prod. Liab. Litig.*, No. 08-WP-65000, 2010 WL 2756947, at *2 (N.D. Ohio July 12, 2010) (quoting ORC § 1345.09); *see also Phillips*, 290 F.R.D. at 480 ("[E]very court to reach the question has concluded that the [O]CSPA's notice requirement is not displaced by [Rule] 23." (collecting cases)); *Kline*, 2010 WL 6298271, at *3–4 (adopting the reasoning in *Whirlpool*); *McKinney*, 744 F. Supp. 2d at 746–47 (adopting the reasoning in *Whirlpool*).

The Court follows the reasoning employed by those courts and concludes that the *Shady Grove* decision does not require Rule 23 to displace the OCSPA's class action notice requirement.

## 2. The Greene Plaintiffs have not satisfied the notice requirement

The Greene Plaintiffs argue that because the Ohio Attorney General has promulgated rules that prohibit companies from making "any representations" that lack "a reasonable basis in fact," Defendant was "on notice that making false or misleading allergy claims — and exaggerating FDA support for these claims — would be considered deceptive in Ohio." (Pls. Opp'n 12–13 (citing Ohio Adm. Code 109:4-3-10).) In addition, the Greene Plaintiffs argue that Defendant was on notice because of consent decrees entered into by the Ohio Attorney General with parties that allegedly made false health claims, which consent decrees were on the Attorney General's public website. (*Id.*) Defendant argues that the challenged statements relating to the Infant Formula "actually have a reasonable basis in fact because they are substantiated by numerous scientific studies," and that consent judgments by the Ohio Attorney General do not constitute sufficient notice under the OCSPA. (Def. Mem. 4–5.)

The Greene Plaintiffs first rely on Ohio Administrative Code 109:4-3-10, which states that it is a deceptive act or practice for a supplier to make any representations in the absence of a reasonable basis in fact. (Pls. Opp'n 12 (citing Ohio Adm. Code 109:4-3-10).) In interpreting this rule, the Ohio Supreme Court has held that the rule "is insufficient to provide prior notice under [ORC § 1345.09(B)] because it does not refer to any particular act or practice." *Volbers-Klarich*, 929 N.E.2d at 502 (quoting *Marrone*, 850 N.E.2d at 36). The Ohio Supreme Court has specified that "[a] general rule is not sufficient to put a reasonable person on notice of the prohibition against a specific act or practice. To permit a generic rule to constitute prior notice for purposes of [ORC § 1345.09(B)] would allow *any* previous determination of a deceptive act or practice to qualify as prior notice for any subsequent alleged deceptive act or practice." *Id.* (quoting *Marrone*, 850 N.E.2d at 36). Thus, the Court rejects the Greene Plaintiffs' argument

that a general rule promulgated by the Ohio Attorney General can provide adequate notice for purposes of an OCSPA class action.

The Greene Plaintiffs next rely on various consent decrees into which the Ohio Attorney General entered with parties that allegedly made false health claims. (Pls. Opp'n 12–13.) Plaintiffs rely on *Charvat v. Telelytics, LLC*, No. 05-AP-1279, 2006 WL 2574019, at *11 (Ohio Ct. App. Aug. 31, 2006), for the proposition that consent decrees constitute "court determinations" that provide sufficient notice under the OCSPA. *See* ORC § 1345.09(B) (stating that prior notice may be in the form of "an act or practice determined by [an Ohio court] to violate section 1345.02, 1345.03, or 1345.031 of the Revised Code and committed after the decision containing the determination has been made available for public inspection [by the Attorney General]").

In *Charvat*, the court explained that a consent judgment is not a judgment on the merits, but rather a reflection of a settlement between the parties, and it therefore lacks precedential value. *Charvat*, 2006 WL 2573019, at *6. The court reasoned that, nevertheless, "a consent judgment's precedential value is not determinative under [ORC section 1345.09(B)] because the statute specifically refers to a court's determination, not a judgment." *Charvat*, 2006 WL 2573019, at *11. Thus, according to the *Charvat* court, a court's approval of a consent judgment in which an entity is alleged to have violated the OCSPA constitutes a "determination" by that court that a particular practice is circumscribed under section 1345.09(B). *See id.* ("[E]ven within a consent judgment, 'an act or practice determined by a court' to violate the OCSPA is actionable under [section 1345.09(B)].")

Since *Charvat* was decided, however, several federal courts in Ohio have questioned its ruling. These courts reason that the OCSPA requires the Attorney General to make available for

public inspection "all judgments, including supporting opinions, by courts of this state that determine the rights of the parties . . . determining that specific acts or practices violate" the OCSPA, and, reading that broad command together with ORC section 1345.09, "it is clear that the reference to a court's 'determination' in [section] 1345.09(B) is a reference to a court's final determination, *i.e.* a judgment with supporting reasoning." *Pattie v. Coach, Inc.*, 29 F. Supp. 3d 1051, 1056 (N.D. Ohio 2014) (quoting *Gascho v. Glob. Fitness Holdings, LLC*, 918 F. Supp. 2d 708, 715 (S.D. Ohio 2013)); *see also Ice v. Hobby Lobby Stores, Inc.*, No. 14-CV-744, 2015 WL 5731290, at *4 (N.D. Ohio Sept. 29, 2015) (rejecting *Charvat*); *Gascho*, 918 F. Supp. 2d at 715 ("Because the reasoning of a consent judgment is not necessarily that of the court, it has no precedential value, and cannot be considered the court's 'opinion.'"); *Robins v. Glob. Fitness Holdings, LLC*, 838 F. Supp. 2d 641, 649 (N.D. Ohio 2012) (rejecting reliance on consent judgments for prior notice); *Kline*, 2010 WL 6298271, at *8 (characterizing the *Charvat* decision as "isolated" and holding that it is "neither persuasive nor binding" on a federal district court), *report & recommendation adopted*, No. 08-CV-408, 2011 WL 1125346 (S.D. Ohio Mar. 25, 2011).

The Court is not persuaded that consent judgments reflect a court's "determination" that an act or practice violated the OCSPA. Indeed, as the *Charvat* court noted, "a consent judgment typically is not a judgment on the merits, but a contract between the parties that the court reduces to a judgment," *Charvat*, 2006 WL 2574019, at *11. In addition, "when a court approves a settlement between the parties, the resulting consent judgment or decree, and the reasoning applied therein, does not reflect the considered judgment of the court. If it did, the determination would have precedential value." *Gascho*, 918 F. Supp. 2d at 716. Accordingly, the Court finds that the consent judgments that the Greene Plaintiffs rely on as having provided prior notice

under the OCSPA do not satisfy the notice prerequisite.  The Court therefore dismisses the Greene Plaintiffs' OCSPA claim.

### ii.   ODTPA

In count two of the Complaint, the Greene Plaintiffs allege that Defendant's "false or misleading advertising . . . constitutes a deceptive trade practice under [the ODTPA]" because Defendant "represented that goods have characteristics, ingredients, uses, benefits or quantities that they do not have" and "represented that goods have sponsorship, approval, or characteristics that they do not have."  (Compl. ¶ 107 (citing ORC § 4165.02 (alterations omitted)).)  Defendant argues that "[t]he vast majority of Ohio district courts and lower state courts hold that 'the ODTPA is not available to consumers.'"  (Def. Mem. 14 (quoting *Phillips*, 290 F.R.D. at 484).)

The ODTPA authorizes actions by a "person who is likely to be damaged by a person who commits a deceptive trade practice" or a "person who is injured by a person who commits a deceptive trade practice."  ORC § 4165.03(A)(1)–(2).  A "person" is defined under the ODTPA to include "an individual, corporation, government, governmental subdivision or agency" or "any other legal or commercial entity."  *Id.* § 4165.01(D).

"The Ohio Supreme Court has not yet addressed whether a consumer may pursue a claim under the ODTPA, and there is a split of authority between the Northern and Southern Districts of Ohio, and even within the Southern District, on the issue."  *Terelsky v. Fifth Dimension, Inc.*, No. 15-CV-374, 2015 WL 7254189, at *2 (S.D. Ohio Nov. 17, 2015).  However, the majority of courts to address the issue have reasoned that the ODTPA is substantially similar to section 43(a) of the Lanham Act, which confers standing on "any person who believes that he or she is likely to be damaged" by conduct prohibited under 15 U.S.C. § 1125(a).  *Id.*; *see In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801, 874 (S.D. Ohio 2012); *Dawson v. Blockbuster, Inc.*, No. 86451,

2006 WL 1061769, at *4 (Ohio App. Ct. Mar. 16, 2006), *cert. denied*, 852 N.E.2d 190 (Ohio 2006). These courts have determined that, because "the ODTPA is substantially similar to Section 43(a) of the Lanham Act and the Lanham Act protects the interests of a purely commercial class that does not include individual consumers," the ODTPA does not confer standing on consumers. *Terelsky*, 2015 WL 7254189, at *2 (quoting *In re Porsche*, 880 F. Supp. 2d at 874); *see, e.g.*, *Citimortgage, Inc. v. Crawford*, 934 F. Supp. 2d 942, 950 (S.D. Ohio 2013) ("[A] consumer does not have standing to [s]ue under the [O]DTPA."); *Phillips*, 290 F.R.D. at 484 ("[T]he [c]ourt holds that consumers lack standing to bring claims under the [O]DTPA."); *Hamilton v. Ball*, 7 N.E.3d 1241, 1253 (Ohio App. Ct. 2014) (holding that consumers lack standing to file suit under the ODTPA).

The Greene Plaintiffs cite two cases that hold otherwise, and they are the only two the Court has located that hold that the plain language of the ODTPA is not so restrictive that it precludes a consumer from bringing an action under the statute. *See Schumacher v. State Auto. Mut. Ins. Co.*, 47 F. Supp. 3d 618, 630–33 (S.D. Ohio 2014); *Bower v. Int'l Bus. Machs., Inc.*, 495 F. Supp. 2d 837, 842–44 (S.D. Ohio 2007). However, where, as here, a state's highest court has not directly addressed an issue, the Court is bound by the decision of the state's appellate courts. *See V.S. v. Muhammad*, 595 F.3d 426, 432 (2d Cir. 2010) (holding that a federal court "is bound to apply the law as interpreted by a state's intermediate appellate courts unless there is persuasive evidence that the state's highest court would reach a different conclusion." (citing *Pahuta v. Massey–Ferguson, Inc.*, 170 F.3d 125, 134 (2d Cir. 1999))); *see also Greenberg v. Greenberg*, 646 F. App'x 31, 31 (2d Cir. 2016) ("In the absence of any statement by the state's highest court," federal courts are "bound to apply the law as interpreted by a state's intermediate appellate courts unless there is persuasive evidence that the state's highest court would reach a

different conclusion." (quoting *V.S.*, 595 F.3d at 432)).

In *Dawson*, the Ohio Court of Appeals held that consumers do not have standing to raise ODTPA claims because the ODTPA and the Lanham Act are "substantially similar" and because all federal courts of appeals to have considered the issue have held that consumers do not have standing to sue under the Lanham Act. *See Dawson*, 2006 WL 1061769 at *3–4. The Ohio Supreme Court declined to accept the appeal for review in *Dawson*. *See* 852 N.E.2d 190 (Ohio 2006).

The Greene Plaintiffs have failed to present persuasive evidence that the Ohio Supreme Court would consider this issue differently than the Ohio Court of Appeals, particularly in view of several Ohio Supreme Court decisions that have recognized the substantial similarity between the ODTPA and the Lanham Act. *See, e.g.*, *Chandler & Assoc. v. Am.'s Healthcare Alliance*, 709 N.E.2d 190, 195 (Ohio App. Ct. 1997) ("When adjudicating claims arising under the [ODTPA], Ohio courts shall apply the same analysis applicable to claims commenced under analogous federal law."); *Yocono's Rest., Inc. v. Yocono*, 651 N.E.2d 1347, 1350–51 (Ohio App. Ct. 1994) (applying a Lanham Act analysis to claims under the ODTPA); *Cesare v. Work*, 520 N.E.2d 586, 589 (Ohio App. Ct. 1987) ("Where claims are made under the [ODTPA], Ohio courts are to apply essentially the same analysis as that applied in assessing the law of unfair competition under the federal statutes."). Accordingly, the Court adopts the view of the Ohio Court of Appeals and the majority of district courts to consider the issue, and holds that the ODTPA does not confer standing upon consumers. *See Holbrook v. La.-Pac. Corp.*, 533 F. App'x 493, 497 (6th Cir. 2013) (citing *Dawson* to affirm the district court's holding that consumers lack standing to bring claims under the ODTPA). The Court therefore dismisses the Greene Plaintiffs' ODTPA claim.

### e. North Carolina statutory claim

In count three of the Complaint, the Greene Plaintiffs allege that Defendant's health claims regarding the Infant Formula "had the tendency and capacity to mislead" and constituted deceptive acts or practices and unfair methods of competition under the NCDTPA. (Compl. ¶¶ 113–14 (citing N.C. Gen. Stat. Ann. § 75-1.1).)

Defendant argues that the Greene Plaintiffs' NCDTPA claim is not pled with particularity and should be dismissed pursuant to Rule 9(b) of the Federal Rules of Civil procedure because the Greene Plaintiffs "vaguely allege[] that [Plaintiff Wilkerson] purchased [the Infant Formula] after" reviewing a number of advertisements but "makes no allegation that [the annexed advertisement] was material to her decision to purchase" the Infant Formula. (Def. Mem. 15.) The Greene Plaintiffs argue that the Rule 9(b) pleading standard does not apply to NCDTPA claims, but that the Greene Complaint nevertheless satisfies Rule 9(b) because Plaintiff Wilkerson has alleged that Defendant's allergy claims informed her decision to purchase the Infant Formula and that she would not have paid a premium for the formula if she had known the allergy claims were false and misleading. (Pls. Opp'n 15.)

The parties identify divergent authority on whether NCDTPA claims[10] are subject to the Rule 9(b) standard. (*See id.* at 14 n.31 (citing *CBP Res., Inc. v. SGS Control Servs.*, 394 F. Supp. 2d 733, 739 (M.D.N.C. 2005) (Rule 9(b) does not apply)); Def. Mem. 15 (citing *Hilco Transp.*,

---

[10] "Under North Carolina law, to establish a prima facie claim under the [NCDTPA], a plaintiff must show: '(1) defendant committed an unfair or deceptive act or practice, (2) the act[] in question is in or affecting commerce, and (3) the act proximately caused injury to the plaintiff.'" *Bayer Cropscience LP v. Albemarle Corp.*, --- F. App'x ---, ---, 2017 WL 2645547, at *3 (4th Cir. June 20, 2017) (quoting *Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001)). Because Defendant does not argue that the Greene Plaintiffs' NDTPA claim is otherwise deficient, the Court declines to consider whether the Greene Plaintiffs have stated a prima facie claim under the NDTPA.

*Inc. v. Atkins*, No. 14-CVS-8677, 2016 WL 197133, at *10 (N.C. Super. Jan. 15, 2016) (Rule 9(b) "may" apply)); Def. Reply 6 (citing *Topshelf Mgmt., Inc. v. Campbell-Ewald Co.*, 117 F. Supp. 3d 722, 732 (M.D.N.C. 2015) (holding that "several of the reasons" that led the court not to apply Rule 9(b) in *CBP Res., Inc.* "either do not apply in the present case or can no longer be maintained in light of more recent developments")).) The Court declines to decide whether Rule 9(b) applies to NCDTPA claims because, even assuming it does, the Greene Plaintiffs have met the Rule 9(b) pleading standard.

"Rule 9(b) requires that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016) (alteration in original) (quoting Fed. R. Civ. P. 9(b)). "To satisfy this Rule, a complaint alleging fraud must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"[11] *Id.* (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). "Ultimately, whether a complaint satisfies Rule 9(b) depends upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive

---

[11] In determining whether Plaintiffs have satisfied the Rule 9(b) pleading standard, Second Circuit law governs. *See In re Ford Fusion & C-Max Fuel Econ. Litig.*, No. 13-MD-2450, 2015 WL 7018369, at *13 (S.D.N.Y. Nov. 12, 2015) ("In evaluating the applicability of Rule 9(b), the Court also notes that, as is always the case, it is bound by Second Circuit law pertaining to the applicability of Rule 9(b)." (citing *Nw. Mut. Life Ins. Co. v. Banc of Am. Sec., LLC*, 254 F. Supp. 2d 390, 396–97 (S.D.N.Y. 2003))); *Schwartzco Enters. LLC v. TMH Mgmt., LLC*, 60 F. Supp. 3d 331, 361 (E.D.N.Y. 2014) ("[B]ecause Rule 9(b) is a rule promulgated pursuant to a federal statute, this Court is required to follow the precedent of the Court of Appeals for the Second Circuit with respect to the interpretation and application of Rule 9(b)." (alteration in original) (quoting *Nw. Mut. Life Ins.*, 254 F. Supp. 2d at 396)).

pleading." *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 616 (S.D.N.Y. 2013); *see Kane ex rel, U.S. v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 383 (S.D.N.Y. 2015) (quoting same); *U.S. ex rel. Bilotta v. Novartis Pharma. Corp.*, 50 F. Supp. 3d 497, 508 (S.D.N.Y. 2014) (quoting same); *U.S. ex rel. Kester v. Novartis Pharma. Corp.*, 23 F. Supp. 3d 242, 258 (S.D.N.Y. 2014) (quoting same); *see also Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (discussing the purpose of the particularity requirement and emphasizing fair notice to the defendant).

The Greene Plaintiffs specify in the Complaint and attach to the Complaint examples of the representations by Defendant that the Greene Plaintiffs allege are false and misleading, including the representations that the Infant Formula is the "1st & only routine formula to reduce the risk of developing allergies" and that the Infant Formula is "the first and only formula brand made from 100% whey protein hydrolyzed, and that meets the criteria for a[n] FDA Qualified Health Claim for atopic dermatitis." (Compl. ¶¶ 56–61 (capitalization omitted); Exs. A–F.) The Greene Plaintiffs allege that these representations were located in several places, including on a sticker placed on the Infant Formula, on the packaging in which the Infant Formula was sold, in a television commercial dated April 9, 2012, and in a magazine advertisement dated August 5, 2013. (Compl. ¶¶ 60, 63.) The Greene Plaintiffs also allege that the representations are false and misleading because the Infant Formula does not reduce the risk that infants will develop allergies and because Defendant failed to qualify its health claim regarding the Infant Formula's ability to reduce the risk of infants developing atopic dermatitis in accordance with the FDA's proposals. (*Id.* ¶¶ 56–64.) The Greene Plaintiffs further allege that they viewed and relied on these representations before purchasing the Infant Formula. (*Id.* ¶¶ 72–74.)

Based on these allegations, the Greene Plaintiffs have identified with particularity the

allegedly deceptive representations, the speaker, what was stated, when it was stated and where the statements were made. The Greene Plaintiffs have also explained why they allege that the statements are deceptive and that the statements were material. (*See id.*) These allegations satisfy Rule 9(b). *See In re Ford Fusion & C-Max Fuel Econ. Litig.*, No. 13-MD-2450, 2015 WL 7018369, at *33 (S.D.N.Y. Nov. 12, 2015) (holding that the plaintiffs "sufficiently alleged the who, what, when, where, and why of the fraud at issue under Rule 9(b)" because the plaintiffs identified the "*specific ads* that made *specific promises*" regarding the products at issue); *Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 298 (S.D.N.Y. 2015) (finding that the plaintiff satisfied Rule 9(b) because the plaintiff alleged that the defendants "made personal guarantees in national media advertisements," that the plaintiff "heard [the] [d]efendants' media advertisements" and that the plaintiff "relied on these representations"); *In re Frito-Lay N. Am., Inc. All Nat. Litig.*, No. 12-MD-2413, 2013 WL 4647512, at *23–24 (E.D.N.Y. Aug. 29, 2013) (holding that the plaintiffs met the Rule 9(b) heightened pleading requirement because the plaintiffs "allege[d] that defendants PepsiCo and Frito–Lay (the 'who') falsely stated that the products are 'All Natural,' but in fact, are not . . . (the 'what')," and further alleged "[w]hen the defendants labeled, and the plaintiffs purchased, the products between January 1, 2010 and the present (the 'when'), the plaintiffs relied on this representation, which was placed prominently on the products' packaging (the 'where')"); *cf. Amos v. Biogen Idec Inc.*, 28 F. Supp. 3d 164, 172 (W.D.N.Y. 2014) (holding that the plaintiff did not satisfy the Rule 9(b) standard where the plaintiff "made only general allegations of fraudulent conduct," upon information and belief, and failed to identify the specific alleged misrepresentations).

The Court therefore finds that the Greene Plaintiffs have identified the representations that they allege are false and misleading pursuant to Rule 9(b) and have pled that those

representations were material with requisite particularity. The Court therefore denies Defendant's motion to dismiss the Greene Plaintiffs' NCDTPA claim.

### f. New York statutory claims

In counts one and two of the Manemeit Complaint, Plaintiff Manemeit alleges that Defendant violated sections 349 and 350 of the GBL by engaging in "consumer-oriented conduct" that falsely and misleadingly advertised the allergenic benefits of the Infant Formula. (Manemeit Compl. ¶¶ 93–108.)

Defendant argues that the GBL claims should be dismissed because Plaintiff failed to plead an injury from the alleged misrepresentation and because Plaintiff "freely admits that [Defendant's] use of the [qualified health claim] in its marketing materials was expressly permitted by FDA," so the safe harbor provisions of the GBL apply. (Manemeit Def. Mem. 2.) Plaintiff argues that she alleges, under a price-premium theory of injury, that she would not have paid as much as she did for the Infant Formula had she known the allergy claims were false, and that the GBL's safe harbor provisions do not apply here. (Manemeit Opp'n 8–9.)

The Court first considers whether Plaintiff has sufficiently alleged an injury under GBL sections 349 and 350 and then considers whether the safe harbor provision under GBL section 349 provides a defense to Plaintiff's claims.

### i. GBL sections 349 and 350

GBL section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349. GBL section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 350. To assert a claim under either section, "a plaintiff must allege that a defendant has engaged in

(1) consumer-oriented conduct that is (2) materially misleading and that (3) [the] plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (citing *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940 (2012)); *see Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000) (citing the elements for a prima facie case under section 349).

Claims under GBL sections 349 and 350 are not subject to the pleading-with-particularity requirements of Rule 9(b). *Schwartzco Enters. LLC v. TMH Mgmt., LLC*, 60 F. Supp. 3d 331, 359 (E.D.N.Y. 2014) (quoting *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005)); *see also Leonard*, 2012 WL 764199, at *19 (considering case law and discerning a categorical rule that New York GBL section 349 claims, "regardless of whether they 'sound in fraud,' or are premised on specific misrepresentations rather than an 'advertising scheme,' are not subject to the heightened pleading requirement of Rule 9(b)"). With an exception not relevant here,[12] "[t]he standard for recovery under . . . [section] 350, while specific to false advertising, is otherwise identical to section 349." *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324 n.1 (2002).

"An actual injury claim under [s]ection 349 typically requires a plaintiff to 'allege that, on account of a materially misleading practice, she purchased a product and did not receive the full value of her purchase.'" *Izquierdo v. Mondelez Int'l, Inc.*, No. 16-CV-4697, 2016 WL 6459832, at *7 (S.D.N.Y. Oct. 26, 2016) (quoting *Orlander*, 802 F.3d at 302). This prong may be satisfied through an allegation that a plaintiff overpaid for the product, or, stated differently,

---

[12] "To prevail on a claim under GBL [section] 350, a plaintiff must demonstrate reliance on defendants' false advertising. However [section] 349 does not require proof of reliance." *Ackerman v. Coca-Cola Co.*, No. 09-CV-0395, 2010 WL 2925955, at *23 (E.D.N.Y. July 21, 2010) (first citing *Leider v. Ralfe*, 387 F. Supp. 2d 283, 292 (S.D.N.Y. 2005); and then citing *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000)).

"by a claim that a plaintiff paid a premium for a product based on [the] defendants' inaccurate representations." *Ackerman v. Coca-Cola Co.*, No. 09-CV-0395, 2010 WL 2925955, at *23 (E.D.N.Y. July 21, 2010); *see also Orlander*, 802 F.3d at 302 (explaining that in some cases the price premium theory "show[s] that [the] plaintiff paid more than they would have for the good but for the deceptive practices of the defendant-sellers").

Here, Plaintiff alleges that if she had known Defendant's allergy claims were false, she would not have paid as much as she did for the Infant Formula, and further states that parents value a formula's ability to protect their children from developing allergies. (Manemeit Compl. ¶¶ 13, 53, 74–75, 100–01, 106, 135, 140.) Plaintiff also alleges that another formula named "Parent's Choice," which did not make allergy claims, is priced at a forty-one percent discount to the Infant Formula, and that Defendant suggested that Defendant's inability to make the allergy claims negatively affected sales. (*Id.* ¶¶ 77–78.) Plaintiff further alleges that she did not receive the benefit of her bargain because she paid for a benefit — the reduced risk of allergies — that the Infant Formula did not provide. (*Id.*) These allegations are sufficient to state an injury under GBL sections 349 and 350 because they "claim that [] [P]laintiff paid a premium for a product based on [Defendant's] inaccurate representations." *See Ackerman*, 2010 WL 2925955, at *23; *see also Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 288–89 (S.D.N.Y. 2014) (finding a sufficiently-pled section 349 injury where the plaintiff alleged that he would not have paid the price charged for "fat-free" milk had he known it contained fat); *Ebin v. Kangadis Food Inc.*, No. 13-CV-2311, 2013 WL 6504547 (S.D.N.Y. Dec. 11, 2013) (deeming the plaintiff's allegations sufficient to state a claim under GBL 349 where "[t]he deception is the false and misleading label, and the injury is the purchase price"); *Lazaroff v. Paraco Gas Corp.*, 967 N.Y.S.2d 867 (N.Y. Sup. Ct. 2011) (finding a sufficiently-pled section 349 injury where the plaintiff alleged

that he would not have paid the price charged for a "[twenty] pound" propane cylinder had he known it contained only fifteen pounds of propane).

Relying on *Izquierdo*, 2016 WL 6459832, at *7, Defendant argues that Plaintiff "must assert that she could have purchased a substitute infant formula that also was made from [partially hydrolyzed whey protein] but which does not contain the [qualified health claim] or other alleged misstatement." (Manemeit Def. Mem. 12.) Defendant argues that *Izquierdo* is instructive because, in that case, the plaintiffs brought a putative class action alleging that the defendant packaged its candy to give the appearance that the package contained more candy than it actually did, in violation of GBL section 349. *Izquierdo*, 2016 WL 6459832, at *1–2. The court dismissed the plaintiffs' claim, finding that "[c]omparing the Candy to Hot Tamales and Junior Mints is the saccharine equivalent of comparing apples with oranges. Such a comparison tells the [c]ourt nothing about the value of the Candy, or whether the cost of the Candy was inflated by [the defendant's] allegedly misleading packaging." *Id.* at *7. In addition, the court found that it was not clear that the price the plaintiffs paid "flowed from any act of [the defendant]" because the complaint did not allege that the defendant, as opposed to the movie theater where plaintiffs had purchased the candy, set the price of the candy and benefited from its price inflation. *Id.*

To the extent that *Izquierdo* merely holds that plaintiffs cannot redress an injury under GBL sections 349 or 350 where they do not "allege[] that they paid a *higher* price for the [product] than they otherwise would have, absent deceptive acts," *see id.*, the Court finds that Plaintiffs' allegations satisfy *Izquierdo* because she has alleged that she paid a higher price for the Infant Formula than she would have paid absent the allergy claims. (Manemeit Compl. ¶ 77.) However, to the extent that *Izquierdo* holds, as Defendant suggests, that Plaintiff must identify a

precisely comparable product in order to allege a GBL section 349 or 350 claim under a price premium theory, *Izquierdo* contradicts the weight of the law in this Circuit. Courts routinely allow complaints that lack allegations of both cheaper and exactly comparable products to survive motions to dismiss. *See Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 8 F. Supp. 3d 467, 481–82 (S.D.N.Y. 2014) (explaining that courts "have found valid [section] 349 claims despite plaintiffs not identifying competitors or prices" and that "while identifying the prices of competing products in the [c]omplaint would strengthen [the p]laintiff's allegation of injury," the allegations are not necessary to state a claim); *see also Orlander*, 802 F.3d at 302 (reversing a district court and holding that the plaintiff had stated claims under GBL sections 349 and 350 because "[p]laintiff has alleged that he purchased a two-year 'Carry-in' Protection Plan but did not receive the services that [d]efendant misleadingly told [p]laintiff he was purchasing"); *Stoltz v. Fage Dairy Processing Indus, S.A.*, No. 14-CV-3826, 2015 WL 5579872, at *22 (E.D.N.Y. Sept. 22, 2015) (finding a sufficiently-pled section 349 injury where the plaintiffs alleged that "through the deceptive practice of marketing and selling their products . . . [the defendants] have been able to command a premium price by deceiving consumers about the attributes of their yogurts and distinguishing themselves from similar products"); *Weisblum*, 88 F. Supp. 3d at 292–93(finding a sufficiently-pled section 349 injury where the plaintiff alleged that he was damaged in the amount of the difference in value between the product as advertised and the product as actually sold); *Koenig*, 995 F. Supp. 2d at 288 (finding a sufficiently-pled section 349 injury where the plaintiffs alleged that they paid price premiums based on the defendants' misrepresentations without identifying a specific comparable product).

In addition, to the extent that Defendant asks the Court to assess the actual comparability of the Parent's Choice formula or determine whether other characteristics of the Infant Formula

justified its higher price, these are factual determinations that cannot be resolved on a motion to dismiss. *See Kardovich v. Pfizer, Inc.*, 97 F. Supp. 3d 131, 140 (E.D.N.Y. 2015) ("[I]ssues of fact, credibility and the weight of the evidence are not properly considered on a motion to dismiss."); *see also Ebin*, 2013 WL 6504547, at *4–5 (finding a sufficiently-pled section 349 injury where the parties disputed the reason for price distinctions between the allegedly mislabeled product and a comparable product). The Court therefore denies Defendant's motion to dismiss the GBL claims for failure to state an injury.

### ii. Safe harbor provisions

Defendant also argues that the qualified health claims on the Infant Formula labels were approved by the FDA 2011 Letter, and therefore Plaintiff Manemeit's claims are barred by the safe harbor provisions of GBL sections 349 and 350. (Manemeit Def. Mem. 12–13.) Plaintiff argues that the FDA 2011 Letter was not a "regulation," such that compliance with it would provide safe harbor immunity, and that, even if the FDA 2011 Letter fell within the scope of the safe harbor provision, Defendant did not comply with the FDA 2011 Letter. (Manemeit Opp'n 10.)

GBL section 349(d) states:

> In any such action it shall be a complete defense that the act or practice is, or if in interstate commerce would be, subject to and complies with the rules and regulations of, and the statutes administered by, the federal trade commission or any official department, division, commission or agency of the United States as such rules, regulations or statutes are interpreted by the federal trade commission or such department, division, commission or agency or the federal courts.

N.Y. Gen. Bus. Law § 349(d). GBL section 350-d states:

> In any such action it shall be a complete defense that the advertisement is subject to and complies with the rules and regulations of, and the statutes administered by the Federal Trade Commission or any official department, division, commission or agency of the state of New York.

N.Y. Gen. Bus. Law. § 350-d.

Both safe harbor provisions require Defendant to identify a "rule" or "regulation" with which it has complied. However, the only rule or regulation Defendant identifies is the FDA 2011 Letter, which applies only to Defendant's labels and not to its advertisements. (*See* FDA 2011 Letter at 2.) Furthermore, Defendant has not explained why or how the FDA 2011 Letter qualifies as a "rule" or "regulation" under the safe harbor provisions, and, absent any support, the Court is not convinced that it does. *See, e.g.*, *Carias v. Monsanto Co.*, No 15-CV-3677, 2016 WL 6803780, at *8 (E.D.N.Y. Sept. 30, 2016) (finding that the EPA's approval of a pesticide label did not fall within the GBL safe harbor in part because the approval lacked preemptive force); *In re Frito-Lay N. Am. Inc. All Nat. Litig.*, 2013 WL 4647512, at *22 (denying a motion to dismiss based on safe harbor because "it is not clear that FDA's [non-binding] guidance on 'natural' labeling is a 'rule or regulation' within the meaning of [sections] 349(d) and 350-d"). Finally, even if the FDA 2011 Letter qualified as a "rule" or "regulation" under the safe harbor provisions, Plaintiff's claim is premised on the idea that the Infant Formula was *not* in compliance with the FDA 2011 Letter, which specified qualified health claims that Defendant could place on its labels and prohibited Defendant from asserting that the Infant Formula could reduce the risk of infant allergies. (*See* Manemeit Opp'n 11; Manemeit Compl. ¶¶ 11–12, 65–71.) Thus, it is not clear that Defendant's labeling "compl[ied] with" the FDA's guidance, even

if that guidance qualifies as a rule or regulation under the safe harbor provisions.[13]

Defendant cannot obtain safe harbor under sections 349 or 350 because Defendant has not argued — and the Court is not convinced — that the FDA 2011 Letter constitutes a "rule" or "regulation" under the safe harbor provisions and, even if the FDA 2011 Letter did constitute a "rule" or "regulation," the parties dispute whether Defendant complied with the FDA 2011 Letter. Because neither safe harbor applies to Defendant's alleged conduct, the Court denies Defendant's motion to dismiss Plaintiff's GBL claims.

### g. Common law claims

In counts four through seven of the Greene Complaint and counts three through six of the Manemeit Complaint, Plaintiffs bring claims for fraudulent concealment, intentional misrepresentation, negligent misrepresentation and unjust enrichment. (Greene Compl. ¶¶ 118–49; Manemeit Compl. ¶¶ 109–40.) Defendant argues that Plaintiffs have failed to allege at least one element of each common law claim, but does not otherwise argue that Plaintiffs' common law claims are insufficient.[14] (*See* Def. Mem. 16) The Court accordingly analyzes the particular deficiencies that Defendant argues are fatal to each of Plaintiffs' claims.

---

[13] In addition, with respect to the safe harbor provision in section 350, Defendant has not identified a rule, regulation, or statute administered by the Federal Trade Commission or a state agency with which the Infant Formula complies. Based on the plain language of the statute, the FDA 2011 Letter does not provide Defendant with a defense against the allegedly deceptive and misleading claims because section 350 does not provide safe harbor for an entity's compliance with an FDA regulation — only for compliance with the regulations of "the Federal Trade Commission or any official department, division, commission or agency of the state of New York." N.Y. Gen. Bus. Law § 350-d. Defendant has not provided support to the contrary.

[14] Defendant generally argues that Plaintiffs have not made particularized allegations of falsity, as required under Rule 9(b), and the Court addresses that argument in section II(g), *infra*.

### i.   Fraudulent concealment

Defendant argues that Plaintiffs have not alleged a fiduciary or special relationship between the parties that would support a claim for fraudulent concealment.[15]  (Def. Mem. 16.) Plaintiffs argue that New York courts do not require a fiduciary relationship where, as here, the defendant made a "partial or ambiguous statement" and "had superior knowledge that was not available to [the plaintiff]."  (Pls. Opp'n 18.)

"The elements of fraudulent concealment under New York law are: a relationship between the contracting parties that creates a duty to disclose, knowledge of the material facts by the party bound to disclose, scienter, reliance and damage."  *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 582 (2d Cir. 2005); *see also De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 314 (S.D.N.Y. 2013) (applying same elements); *Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 124 (E.D.N.Y. 2011) (applying same elements).  "Although a cause of action for fraud may be predicated on acts of concealment, there must first be proven a duty to disclose material information."  *Dembeck v. 220 Cent. Park S., LLC*, 823 N.Y.S.2d 45 (App. Div. 2006) (first citing *Jana L. v. W. 129th St. Realty Corp.*, 801 N.Y.S.2d 132 (App. Div. 2005); and then citing *Kaufman v. Cohen*, 760 N.Y.S.2d 157 (App. Div. 2003)).

"A duty to disclose arises in one of three circumstances: where the parties are in a fiduciary relationship; under the 'special facts doctrine,' where 'one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge'; or where a party has made a partial or ambiguous statement, whose full

---

[15]  Defendant analyzes the common-law claims under New York law for purposes of this motion.  (Def. Mem. 15.)  Plaintiffs do not object, (Pls. Opp'n 15 n.33), and the Court therefore applies New York common law to the claims.

meaning will only be made clear after complete disclosure." *Aetna*, 404 F.3d at 582 (first citing *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 123 (2d Cir. 1984); and then citing *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

Thus, with respect to the duty to disclose, "New York recognizes a cause of action to recover damages for fraud based on concealment, where the party to be charged has superior knowledge or means of knowledge, such that the transaction without disclosure is rendered inherently unfair." *De Sole*, 974 F. Supp. 2d at 314 (internal quotation marks omitted) (quoting *Miele v. Am. Tobacco Co.*, 770 N.Y.S.2d 386, 391 (App. Div. 2003)); *Abrams v. Gen. Motors Corp.*, 466 N.Y.S.2d 124, (N.Y. Sup. Ct. 1983) ("If one party has superior knowledge or has means of knowledge not available to both parties, then he is under a legal obligation to speak and the silence would constitute fraud."). Although normally this duty to disclose arises in the context of "direct business transactions," courts also impose the duty on "a manufacturer who has exclusive knowledge of a product defect or danger." *Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 125 (E.D.N.Y. 2011); *see also Miele*, 770 N.Y.S.2d at 803 (finding that, where the plaintiff alleged that the tobacco company defendants suppressed and disregarded test results not favorable to the tobacco industry and failed to disclose the addictive and dangerous nature of cigarettes, the plaintiff's claim for fraudulent concealment was not preempted by the cigarette smoking act); *Standish-Parkin v. Lorillard Tobacco Co.*, 786 N.Y.S.2d 13, 14 (App. Div. 2004) (same); *Stevenson Equip. v. Chemig Constr. Corp.*, 565 N.Y.S.2d 318, 320 (App. Div. 1991) (holding that a seller of machinery could be found liable for fraudulent concealment for failing to inform a purchaser of its knowledge that the machinery had been stolen), *aff'd* 79 N.Y.2d 989 (1992).

Here, Plaintiffs have pled sufficient facts to support either the theory that Defendant made a "partial or ambiguous statement" or that Defendant "possesse[d] superior knowledge, not readily available to [Plaintiffs], and [knew] that [Plaintiffs were] acting on the basis of mistaken knowledge." *See Brass*, 987 F.2d at 150; *De Sole*, 974 F. Supp. 2d at 314. Plaintiffs allege that Defendant "had a duty to disclose" but "intentionally concealed the fact that [the Infant Formula] did not in fact reduce the risk of infant allergies; that there was little scientific evidence supporting its atopic-dermatitis claims; and that the FDA had not, in fact, unqualifiedly endorsed these atopic-dermatitis claims." (Compl. ¶¶ 119, 121.) Plaintiffs allege that Defendant's representations that the Infant Formula "reduce[d] the risk of developing allergies" intentionally concealed the lack of evidence to support the relationship between hydrolyzed whey protein and infant allergies, (*id.* ¶ 56), and Defendant's representation that the Infant Formula "m[et] the criteria for a FDA Qualified Health Claim for atopic dermatitis" was partial or ambiguous because it implied that the FDA fully endorsed Defendant's claims and exploited consumers' lack of awareness about the "qualified health claim" term of art, (*id.* ¶¶ 57–58). The Court therefore denies Defendant's motion to dismiss Plaintiffs' fraudulent concealment claim.

### ii. Intentional misrepresentation

Defendant argues that Plaintiffs have not alleged specific facts to give rise to an inference of fraudulent intent, as is required to state a claim of intentional misrepresentation in New York. (Def. Mem. 17.) Plaintiffs argue that they have alleged fraudulent intent by alleging that Defendant sponsored and was aware of the Lowe Study, "was aware that there was little support for its atopic-dermatitis claims" and "was aware of the FDA's limited endorsement of its health claims." (Pls. Opp'n 17 (citing Compl. ¶¶ 51–52, 130).)

In a claim for intentional or fraudulent misrepresentation in New York, "a plaintiff must

allege 'a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury.'" *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 178 (2011) (quoting *Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 421 (1996)). Because intentional representation is predicated on some act of fraud, a plaintiff must plead scienter, or fraudulent intent. "As to scienter, conclusory assertions of intent are sufficient 'if supported by facts giving rise to a strong inference of fraudulent intent.'" *Aetna*, 404 F.3d at 579 (quoting *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1057 (2d Cir. 1993)). Although "[g]reat specificity as to scienter is not required," plaintiffs "have the burden of pleading circumstances that provide at least a minimal factual basis for their conclusory allegations of scienter." *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 453 (S.D.N.Y. 2007) (quoting *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994)); *see also Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) (holding that a reviewing court "must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?").

A plaintiff may plausibly plead scienter "through allegations of a motive to deceive and access to accurate information." *Aetna*, 404 F.3d at 579 (internal quotation marks omitted) (quoting *Cohen*, 25 F.3d at 1173–74); *see also Gabriele v. Am. Home Mortg. Serv., Inc.*, 503 F. App'x 89, 97 (2d Cir. 2012) (explaining that a party can demonstrate a "strong inference of fraudulent intent by (1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness" (alterations omitted) (quoting *S.Q.K.F.C., Inc. v. Bell*

*Atl. TriCon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir. 1996))). "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) (citation omitted). However, "a pleading technique that couples a factual statement with a conclusory allegation of fraudulent intent" is insufficient to "support the inference that the defendants acted recklessly or with fraudulent intent." *Rombach*, 355 F.3d at 176 (citation omitted) (finding that the plaintiffs had not alleged facts to support an inference that the defendants knew of specific facts contrary to their public statements or that the defendants had a motive to defraud the plaintiffs).

Here, the Court does not consider whether Plaintiffs have adequately pled facts to support an inference of motive and opportunity because Plaintiffs have adequately pled facts to support an inference of "conscious misbehavior or recklessness." *See Gabriele*, 503 F. App'x at 97; *see also Glidepath*, 590 F. Supp. 2d at 456 n.8 ("However, [the p]laintiffs need not plead both 'motive and opportunity' *and* 'conscious misbehavior or recklessness' to prove scienter. One is sufficient."). Plaintiffs have alleged that Defendant was aware that its statements were false, not only because Defendant sponsored the Lowe Study, whose results did not support Defendant's health claims, but also because Defendant had corresponded with the FDA about how to circumscribe and cabin the health claims to avoid deceiving consumers. (Compl. ¶¶ 48–51, 53, 129–30.) Plaintiffs allege that although Defendant was aware of the attenuated relationship between partially hydrolyzed whey formulas and allergy rates in infants and aware that the FDA considered Defendant's health claims to be "misleading" in the absence of certain heavy qualifiers, Defendant nevertheless marketed and advertised the Infant Formula without the necessary qualifiers. (*Id.* ¶¶ 42, 44, 53–55.) Viewing the facts in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, as required, Plaintiffs have

sufficiently pled facts to support an inference of fraudulent intent. *See Hughes*, 930 F. Supp. 2d at 473 (finding that the plaintiffs adequately alleged scienter where the defendants were aware of lacking supporting scientific evidence for their claims); *Lawati v. Montague Morgan Slade Ltd.*, 961 N.Y.S.2d 5, 8 (App. Div. 2013) (finding that the plaintiff adequately alleged fraud where the defendant told one of plaintiff's investors about business operations in a local office that did not actually exist, "permit[ting] a reasonable inference that he knew the statements . . . were false"); *cf. In re Frito-Lay North Am., Inc. All Nat. Litig.*, 2013 WL 4647512, at *26 (rejecting the plaintiffs' argument that the defendant had displayed "conscious misbehavior or recklessness" where the "plaintiffs never allege[d] that Frito-Lay knew the products contained genetically modified corn" and, "[w]ithout knowledge of falsity, Frito-Lay could not have intended to defraud [the] plaintiffs"); *Edward Tyler Nahem Fine Art, LLC v. Barral*, 24 N.Y.S.3d 634, 635 (App. Div. 2016) ("Although [the] defendant's representations as to good title to the artwork all proved to be false, . . . the record does not sufficiently establish the requisite scienter" because "[t]he evidence does not show that [the] defendant had reason to doubt the veracity of its representation that the artwork was imported lawfully but failed to investigate before making it"). The Court therefore denies Defendant's motion to dismiss the intentional misrepresentation claim.

### iii. Negligent misrepresentation

As with Plaintiffs' claim of fraudulent concealment, Defendant argues that Plaintiffs' negligent misrepresentation claim fails because Plaintiffs have not alleged a fiduciary or special relationship between the parties. (Def. Mem. 16.) Plaintiffs argue that they have pled a special relationship because Defendant had information that undermined the scientific support for its representations and knew consumers would rely on those representations in purchasing the Infant

Formula.  (Pls. Opp'n 17–18.)

"A negligent misrepresentation is actionable under New York law where the defendant has been careless 'in imparting words upon which others were expected to rely and upon which they did or failed to act to their damage,' and whether the author of the statement has 'some relationship or duty . . . to act with care' vis-à-vis the party at whom the statement is directed." *Aetna*, 404 F.3d at 583 (quoting *White v. Guarente*, 43 N.Y.2d 356, 401 (App. Div. 1977)).  The New York Court of Appeals has explained that:

> It is well settled that [a] claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information.

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 910 F. Supp. 2d 543, 546 (S.D.N.Y. 2012) (quoting *Mandarin Trading*, 16 N.Y.3d at 180);; *see also Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir. 2003) ("[T]he elements of negligent representation are: . . . carelessness in imparting words; . . . upon which others were expected to rely; . . . and upon which they did act or failed to act; . . . to their damage . . . to one whom the declarant is bound by some relation or duty of care.").

A duty of care may arise when "there is actual privity of contract between the parties or a relationship so close as to approach that of privity."  *Aetna*, 404 F.3d at 584.  The Second Circuit has noted that although some of its prior decisions "state that a negligent misrepresentation claim will not lie unless the parties share a fiduciary or otherwise 'special' relationship, [those decisions] cannot be read to preclude such a cause of action brought on grounds of privity or near-privity."  *Id.* at 584 n.15.  "Courts have reconciled the discrepancy in the caselaw by recognizing a fiduciary duty as one, but not the exclusive, basis for a negligent misrepresentation claim."  *Id.* (citing *In re Leslie Fay Cos.*, 918 F. Supp. 749, 769 (S.D.N.Y. 1996) ("A fiduciary

relationship may be a sufficient condition to support a claim for negligent misrepresentation absent the existence of actual privity; however, it is not a necessary condition . . . .")). A relationship is considered "so close as to approach that of privity" if: (1) "the defendant makes a statement with the awareness that the statement was to be used for a particular purpose"; (2) "a known party or parties rely on this statement in furtherance of that purpose"; and (3) "there is some conduct by the defendant linking it to the party or parties and evincing [the] defendant's understanding of their reliance." *Id.* at 584. However, "where the statement at issue is directed at a 'faceless or unresolved class or persons,' no duty of care arises." *Id.* (citing *White v. Guarente*, 401 N.Y.S.2d 474, 477 (App. Div. 1977)).

"Because 'casual' statements and contacts are prevalent in business, liability in the commercial context is 'imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.'" *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 188 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Kimmell v. Schaefer*, 89 N.Y.2d 257, 264 (1996)); *see also Dallas Aerospace, Inc.*, 352 F.3d at 788 ("[T]he law of negligent misrepresentation requires a closer degree of trust between the parties than that of the ordinary buyer and seller in order to find reliance on such statements justified."); *Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 623–34 (S.D.N.Y. 2011) ("To state a claim for negligent misrepresentation in connection with a commercial transaction, a plaintiff must plead justifiable reliance."). When a plaintiff fails to allege the existence of a special relationship or the relationship is only "sparsely pled," the plaintiff must "emphatically allege[] the other two factors enunciated in *Kimmell*" — "whether the person making the representation held or appeared to hold unique or special

expertise" and "whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Eternity Glob.*, 375 F.3d at 188 (first quoting *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 103 (2d Cir. 2001); and then quoting *Kimmell*, 89 N.Y.2d at 264).

Here, Plaintiffs have not alleged a special relationship between themselves and Defendant; they are a "faceless or unresolved class or persons" to whom Defendant owed no special duty of care. *See Aetna*, 404 F.3d at 584. Nevertheless, the Court finds that Plaintiffs have "emphatically allege[d] the other two factors enunciated in *Kimmell*," *see Eternity Glob.*, 375 F.3d at 188, because they have alleged that Defendant had unique expertise regarding the lack of scientific support for its representations about infant allergies and atopic dermatitis, and that Defendant intended that Plaintiffs and other consumers would rely on those representations in making purchasing decisions. (*See* Compl. ¶¶ 139–144.)

First, Plaintiffs sufficiently allege that Defendant's health claims, as advertised, were rejected by the FDA and that Defendant was in a unique position to know that. (*Id.* ¶¶ 6, 10, 40–45, 61.) Plaintiffs also sufficiently allege that Defendant was aware of at least one major study that "conclusively refuted" Defendant's health claim, and that Defendant in fact sponsored that study and provided it with staff and funding. (*Id.* ¶¶ 46–52.) These are not merely "knowledge of the particulars of the company's business," which would "not constitute the type of 'specialized knowledge' that is required in order to impose a duty of care." *See Tranium v. Rockwell Collins, Inc.*, No. 16-CV-7005, 2017 WL 1093986, at *4 (S.D.N.Y. Mar. 9, 2017) (citing *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 402 (S.D.N.Y. 2004)). Instead, Defendant's representations suggested specific scientific information to which Plaintiffs would not have had access and on which they could reasonably have relied. *See Hughes*, 930 F. Supp.

2d at 475 (inferring a special relationship between the parties because the defendants "held themselves out as holding a type of special expertise regarding the purported health benefits of Ester-C"); *Wells Fargo Bank Nw., N.A. v. Taca Intern. Airlines, S.A.*, 247 F. Supp. 2d 352, 266–67 (S.D.N.Y. 2002) (finding that the lessee of an airplane had "made expert representations about maintenance costs" of the aircraft and "had unique expertise in the intended conversion of Airbus 300 aircraft from passenger to cargo use," which supported the lessor's argument); *cf. Dallas Aerospace*, 352 F.3d at 788–89 (finding as a relevant factor for dismissal of negligent misrepresentation claim the fact that the plaintiff held the relevant expertise with which to assess the representations at issue); *Eternity Glob.*, 375 F.3d at 189 (dismissing negligent misrepresentation claim where the plaintiff was sophisticated in the same area of expertise as the defendant and, thus, the plaintiff's reliance on the representation was unjustified); *Alley Sports Bar, LLC v. SimplexGrinnell, LP*, 58 F. Supp. 3d 280, 294 (W.D.N.Y. 2014) (dismissing negligent misrepresentation claim against licensed fire alarm contractor because he lacked the specialized training and expertise to justify the plaintiff's reliance on his statement).

Furthermore, Plaintiffs have sufficiently alleged that Defendant knew that Plaintiffs would rely on those representations, as Defendant attempted to obtain FDA approval for the representations and placed them prominently on advertisements and on the Infant Formula itself. (Compl. ¶¶ 42, 45, 55–61.) Moreover, Plaintiffs have plausibly alleged that Defendant placed the advertisements in direct-to-consumer magazines, (*see id.* ¶¶ 62–63), and that Plaintiffs viewed those advertisements and considered the purported allergenic benefits of the Infant Formula in deciding to purchase it, (*id.* ¶ 144). *See Hughes*, 930 F. Supp. 2d at 475 ("[D]efendants understood that the content of their labeling, packaging and website — indeed, all forms of their marketing and branding — would be used by consumers for the purpose of

evaluating Ester-C in comparison to the numerous other brands of vitamin supplements on the market.").

The Court therefore concludes that although the parties engaged in a typical commercial transaction, Plaintiffs have pled facts sufficient to show that Defendant possessed special expertise and knowledge about the health claims on its Infant Formula advertisements and knew that Plaintiffs would rely on those claims. "Given that a determination of whether a special relationship exists is essentially a factual inquiry, these allegations are sufficient to overcome a motion to dismiss." *Suez Equity*, 250 F.3d at 104; *see also Kimmell*, 89 N.Y.2d at 264 ("Whether the nature and caliber of the relationship between the parties is such that the injured party's reliance on a negligent misrepresentation is justified generally raises an issue of fact."). Therefore, the Court denies Defendant's motion to dismiss the negligent misrepresentation claim.

### iv. Unjust enrichment

Defendant argues that Plaintiffs have failed to show "circumstances where equity and good conscience require the [D]efendant to make restitution," as required to support a claim for unjust enrichment under New York law, and that Plaintiffs' unjust enrichment claim is duplicative of their statutory and common-law tort claims. (Def. Mem. 18 (citation and internal quotation marks omitted).); Def. Reply 7.) Plaintiffs argue that they have pled a claim for unjust enrichment because Defendant was "unjustly enriched by [its] sales of [the Infant Formula] through the use of false advertising," and that their unjust enrichment claim is not duplicative because it would "survive the dismissal of their other claims." (Pls. Opp'n 16.)

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good

conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)).  An unjust enrichment claim may be premised on deceptive conduct.  *Cox v. Microsoft Corp.*, 778 N.Y.S.2d 147, 149 (App. Div. 2004) ("[P]laintiffs' allegations that Microsoft's deceptive practices caused them to pay artificially inflated prices for its products state a cause of action for unjust enrichment.").  However, "unjust enrichment is not a catchall cause of action to be used when others fail . . . [and] [a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim."  *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012).  Unjust enrichment is available:

> only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff.  Typical cases are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled.

*Id.* (dismissing unjust enrichment claim where it was based on same allegations as inverse takings claim grounded in trespass).

Plaintiffs have alleged violations of the NCDTPA, OCSPA and ODTPA, as well as several common-law torts.  (Compl. ¶¶ 93–149.)  Plaintiffs' unjust enrichment claim is based on the same allegations as those set forth in support of these other claims, and Plaintiffs have not shown how their unjust enrichment claim differs from their other claims.  Plaintiffs' brief footnote addressing the issue merely argues that "fraudulent intent and a 'special relationship' are not elements of unjust enrichment, so Plaintiffs' unjust-enrichment claim would survive dismissal of their other common-law claims."  (Pls. Opp'n 16 n.34.)  However, as Defendant notes, unjust enrichment does require "a connection between the parties that [is] not too attenuated."  (Def. Reply 6); *see Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511, 517–18

(2012) (dismissing an unjust enrichment claim because "there is no claim that [the plaintiff] had anything other than arm's length business interactions with [the defendants]"); *Mandarin Trading*, 16 N.Y.3d at 182 (dismissing an unjust enrichment claim because of "the lack of allegations that would indicate a relationship between the parties, or at least an awareness by [the defendant] of [the plaintiff's] existence"); *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215–16 (2007) (dismissing an unjust enrichment claim by a plaintiff who claimed to have purchased overpriced tires because, while "a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment," the parties must still have a relationship that is not "too attenuated").

It is not clear that Plaintiffs' unjust enrichment claim would survive dismissal of their other common-law claims, and Plaintiffs' arguments fail to persuade the Court that the unjust enrichment claim is not duplicative of those claims. *See Buonasera v. Honest Co., Inc.*, 208 F. Supp. 3d 555, 568 (S.D.N.Y. 2016) (dismissing an unjust enrichment claim where the plaintiff was "alleging tort causes of action and [] relying on the same set of facts for these causes of action as he [was] for the unjust enrichment claim"); *Goldemberg*, 8 F. Supp. 3d at 483–84 (dismissing an unjust enrichment claim under New York law as duplicative of claims alleging violations of New York statutory law and breach of express warranty); *Koenig*, 995 F. Supp. 2d at 290–91 ("Yet an unjust enrichment claim cannot survive 'where it simply duplicates, or replaces, a conventional contract or tort claim.'" (citing *Corsello*, 18 N.Y.3d at 790–91)). Accordingly, the Court dismisses Plaintiffs' unjust enrichment claim.

### h. Pleading with particularity

Defendant argues that Plaintiffs have failed to "allege any facts to demonstrate falsity" and instead "simply conclude that the statements are false," which is insufficient to state fraud-

based claims under Rule 9(b). (Def. Mem. 7–9.) Plaintiffs argue that "large portions of the Complaint are dedicated to describing the false and misleading nature of [Defendant's] advertisements," and that the Court already considered and rejected Defendant's argument as to falsity in *Hasemann*. (Pls. Opp'n 8.)

As the Court explained in *Hasemann*, Plaintiffs have sufficiently alleged the falsity of Defendant's representation that the Infant Formula is the "1st & only routine formula to reduce the risk of developing allergies," and the misleading nature of Defendant's representation that the FDA had endorsed its qualified health claim regarding atopic dermatitis. *See Hasemann*, 2016 WL 5477595, at *16. The Court declines to reconsider that holding here, where Plaintiffs' claims are predicated on the same alleged conduct and where the allegations in both the *Hasemann* action and here, in *Greene* and *Manemeit*, are nearly identical. Accordingly, Plaintiffs have sufficiently alleged that Defendant's assertion that the Infant Formula reduces the risk of infant allergies is false and that Defendant's qualified health claim regarding atopic dermatitis is misleading.

### i. Motion to strike class allegations

Defendant argues that the Court should strike the nationwide class allegations from the Complaint because "individual issues of fact defeat commonality and predominance" and "differences among state laws with respect to Plaintiffs' common law claims preclude class certification as a matter of law." (Def. Mem. 22, 25 (capitalization omitted).) Plaintiffs argue that Defendant's motion to strike is premature, that they have plausibly alleged that they will be able to satisfy commonality and predominance, and that Defendant has "not identified any material conflicts between the state laws at issue here." (Pls. Opp'n 22.)

### i.    Commonality and predominance

At this stage of the proceeding, the Court declines to strike the nationwide class allegations on commonality and predominance grounds.  Defendant argues that Plaintiffs' common-law claims would require numerous individualized inquiries that preclude class certification.  In particular, Defendant argues that "Plaintiffs' common law claims require a showing that Plaintiffs and the putative class relied on [Defendant's] marketing statements regarding infant allergies and atopic dermatitis.  By definition, reliance is an individualized factual inquiry that will require a series of mini-trials for each putative class member."  (Def. Mem. 23.)

It is possible that some of the putative class members did not rely on Defendant's marketing statements, and it is conceivable that the class as currently drawn will have to be narrowed in order to be certified.  *See In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 147 (S.D.N.Y. 2008) (decertifying a class where reliance element would require individualized inquiry); *see also Kottler v. Deutsche Bank AG*, No. 05-CV-7773, 2010 WL 1221809, at *3 (S.D.N.Y. Mar. 29, 2010) (noting that fraud claims may be "unsuited for class action treatment").  However, the Second Circuit has made clear that it will not adopt a blanket rule barring reliance-based class actions and has noted that some actions involving individual reliance "do appear within the contemplation of Rule 23's drafters" — namely, those actions predicated on similar misrepresentations across class members.  *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 224–25 (2d Cir. 2008) (citing Fed. R. Civ. P. 23(b)(3) Advisory Committee Notes ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.")),

*abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008). Plaintiffs allege the use of similar misrepresentations through a handful of advertisements and commercials marketing the same product quality. (*See* Compl. ¶¶ 57–63.)

Moreover, as courts in this Circuit have repeatedly held, "a determination of whether the Rule 23 requirements are met is more properly deferred to the class certification stage, when a more complete factual record can aid the Court in making this determination." *Mazzola*, 849 F. Supp. 2d at 410; *see, e.g.*, *Chenensky v. N.Y. Life Ins. Co.*, No. 07-CV-11504, 2011 WL 1795305, at *1 (S.D.N.Y. Apr. 27, 2011); *Ironforge.com v. Paychex, Inc.*, 747 F. Supp. 2d 384, 404 (W.D.N.Y. 2010); *Cohen v. Gerson Lehrman Grp., Inc.*, 686 F. Supp. 2d 317, 324 (S.D.N.Y. 2010); *Ruggles v. Wellpoint, Inc.*, 253 F.R.D. 61, 67 (N.D.N.Y. 2008). Defendant's motion to strike is premature because it is based on grounds that are not "separate and apart from the issues that will be decided on a class certification motion." *See Chen–Oster*, 877 F. Supp. 2d at 117. Nor has Defendant persuaded the Court that "it would be impossible to certify the alleged class regardless of the facts Plaintiffs may be able to obtain during discovery." *Mayfield*, 95 F. Supp. 3d at 696. Defendant may re-assert its arguments, if applicable, at the class certification stage.

### ii. Differences in state law

Defendant also argues that "[c]ourts routinely deny certification of a nationwide class when a trial would involve the application of the common law of the [fifty] states." (Def. Mem. 24.) However, courts in the Second Circuit have recognized that "[w]hen a class action raises common issues of conduct that would establish liability under a number of states' laws, it is possible for those common issues to predominate and for class certification to be an appropriate mechanism for handling the dispute." *Reynolds*, 136 F. Supp. 3d at 518 (internal quotation marks omitted) (quoting *Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 79 (E.D.N.Y.

2004)); *see also In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 377 (S.D.N.Y. 2002) (quoting same). "The spectre of having to apply different substantive law does not warrant refusing to certify a class on . . . common-law claims." *Reynolds*, 136 F. Supp. 3d at 518 (quoting *In re LILCO Secs. Litig.*, 111 F.R.D. 663, 670 (E.D.N.Y. 1986)).

To the extent that the laws of various states differ, those concerns may be "lessened where the states' laws do not vary materially." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 127 (2d Cir. 2013); *see also Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir. 2004) ("[I]f the applicable state laws can be sorted into a small number of groups, each containing materially identical legal standards, then certification of subclasses embracing each of the dominant legal standards can be appropriate."), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008). "Thus, the crucial inquiry is not whether the laws of multiple jurisdictions are implicated, but whether those laws differ in a material manner that precludes the predominance of common issues." *In re. U.S. Foodservice Inc.*, 729 F.3d at 127.

Before discovery into the class, it is impossible for the Court to determine how many states' laws are implicated in this action, how many of those laws vary, and how many variances are material to the factors the Court will consider in deciding whether to certify the class. Nor has Defendant yet established that the standards of liability in relevant states are sufficiently different that they would raise insurmountable case management issues or render class issues insufficiently predominant.

Because Defendant has not demonstrated that "it would be futile to allow [P]laintiffs to conduct discovery" or that "[P]laintiffs' theory for class certification is simply foreclosed," *Calibuso*, 893 F. Supp. 2d at 388, the Court denies Defendant's motion to strike the class allegations.

## III. Conclusion

For the foregoing reasons, the Court declines to dismiss or stay the Greene Complaint pursuant to the primary jurisdiction doctrine, grants Defendant's motion to dismiss the Greene Plaintiffs' claims under the OCSPA and ODTPA, and denies Defendant's motion to dismiss the Greene Plaintiffs' claims under the NCDTPA. As to the Manemeit Complaint, the Court denies Defendant's motion to dismiss the claims brought pursuant to sections 349 and 350 of the GBL. As to the Greene and Manemeit Complaints, the Court finds that Plaintiffs lack standing to seek injunctive relief; grants Defendant's motion to dismiss the unjust enrichment claims; denies Defendant's motion to strike the nationwide class allegations; and denies Defendant's motion to dismiss the fraudulent concealment, intentional misrepresentation and negligent misrepresentation claims.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated:  August 2, 2017
        Brooklyn, New York